No. 81-422

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

BOB MILLER,

    Plaintiff and Appellant,

    -vs-

BILL WATKINS and LAVONNE WATKINS,

    Defendants and Respondents.

Appeal from: District Court of the Fourteenth Judicial District,
In and for the County of Musselshell, The Honorable
Nat Allen, Judge presiding.

Counsel of Record:

    For Appellant:

        Leaphart Law Firm; C. W. Leaphart, Jr., Helena,
        Montana

    For Respondents:

        Susan Stearns, Lakewood, Colorado

Submitted on Briefs: July 15, 1982

Decided: September 30, 1982

Filed: SEP 3 0 1982

_____
                        Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Bob Miller, plaintiff and appellant, brought this action in the District Court of the Fourteenth Judicial District, Musselshell County, to recover damages for breach of contract. Bill Watkins, defendant and respondent, pled the affirmative defense of accord and satisfaction for all counts of Miller's complaint. Watkins also filed a counterclaim against Miller for damages for breach of contract, unjust enrichment, malicious prosecution, and defamation. The District Court sitting without a jury found in favor of Watkins denying Miller relief on all counts except for a $1,500 payment due on one horse. The court awarded Watkins actual damages on the breach of contract for $23,000; actual damages in conjunction with the malicious prosecution of $30,000; actual damages for libel and slander in the amount of $25,000; and punitive damages in the amount of $50,000. Miller appeals.

We affirm.

The following issues will be discussed:

(1) Was substantial credible evidence presented at trial to support the findings of fact and conclusions of law?

(2) Were the elements necessary to prove a malicious prosecution action present?

(3) Was evidence presented to support the damage awards?

Bill and LaVonne Watkins are husband and wife and jointly own and operate a public stable. Watkins handles all phases of the business concerning the horses, including the breeding, training, raising, racing and buying and

selling of the horses. He owns several quality stallions which he keeps as studs for breeding purposes and he is a member in good standing of the American Quarter Horse Association (AQHA).

Miller owns and operates a ranch near Jordan, Montana, in Garfield County, and is engaged in the business of raising horses. Prior to 1969, Miller owned many horses which were registered with the AQHA. However, in 1969, Miller was suspended from the AQHA for life and lost the right to have his horses registered. In late 1968 or early 1969, prior to his suspension, Miller transferred ownership of all of his registered quarter horses to two of his relatives, Dr. Purdom and Dr. Shreeves of California, and entered into a partnership agreement with them as a part of the transfer.

Jackie Oakes, a/k/a Jackie Fleming, a/k/a Jackie Miller, who is currently known as Jackie Kerrick (Jackie Oakes), is a member of the AQHA and has not been suspended from membership therein. In 1972, Jackie Oakes and Miller became acquainted through various horse deals and soon thereafter entered into a partnership arrangement for buying and selling horses.

In 1972, Miller was experiencing difficulties with Drs. Purdom and Shreeves. He ended his partnership with the doctors and had the registration of all of the horses transferred to Jackie Oakes. It was at this time that Miller and Jackie Oakes entered into some type of a business arrangement regarding the ownership of the horses and their offspring, since Jackie Oakes could register horses with the AQHA. In 1971 or 1972, forty to fifty registered quarter

horses were moved to Miller's ranch near Jordan.

Prior to the year 1974, Jackie commenced residing with Miller, and the two parties held themselves out to the general public as man and wife, with each authorized to transact business for and on behalf of the other with regard to the horses. During the fall of 1974, Miller and Jackie took a trip to Watkins' ranch. Miller introduced Jackie as his wife and partner indicating that Jackie had full authority to transact business regarding the horses owned jointly by herself and Miller pursuant to her business relationship, as well as her personal relationship with Miller. During that meeting, Watkins entered into a contract with Miller and Jackie, by which Watkins would breed the Miller-Oakes mares with his stallions. The colts born of that arrangement would be registered quarter horses and would be split equally between Watkins and Miller-Oakes. The contract was renewed annually for three years and Miller-Oakes brought mares to the Watkins ranch in 1975, 1976, and 1977.

On October 8, 1974, the Cloverleaf brand, which was owned by Miller or by the Cloverleaf Land and Livestock Company, a Montana corporation, of which Miller was either the sole or majority shareholder, was transferred to Jackie Oakes and recorded in the Montana Brand Office. After the brand had been transferred to Jackie Oakes, various colts and yearlings were branded with the Cloverleaf brand.

In the spring of 1975, pursuant to the breeding agreement, twenty-one head of Miller-Oakes mares were delivered to Watkins' ranch for the purpose of breeding. Several Miller-Oakes colts were either by the side of the mares at

the time they were delivered or born at Watkins' ranch. During the summer of 1975, all of the mares and all of the colts, with the exception of one which died at Watkins' ranch, were returned to Miller and/or Jackie Oakes.

In the spring of 1976, a total of fourteen Miller-Oakes mares were delivered to Watkins' ranch for the purpose of breeding. Some of the mares had colts by their side and some of the mares foaled during the summer of 1976. All of these colts were the result of the breeding of the 1975 season and were "partnership colts" pursuant to the agreement of the parties. Fifteen Breeder's Certificates were issued by Watkins indicating that a total of fifteen colts had been born as a result of the 1975 breeding season.

All of the Miller-Oakes mares and all of the partnership colts were returned to Miller and/or Jackie Oakes, with the exception of two of the partnership colts which were retained by Watkins as a distribution. One of these colts which was retained was the Wicked Felita colt.

In the spring of 1977, a total of thirty Miller-Oakes mares were delivered to Watkins' ranch for breeding purposes. Once again, some of the mares had colts at their side and others foaled at Watkins' ranch during the breeding season. During the summer of 1977, after having been bred, all of the mares with their colts (all colts being partnership colts) were returned to Miller's ranch in Jordan.

The Miller-Oakes mares were not delivered to Watkins' ranch during the spring of 1978, as Watkins refused to continue breeding the mares for two reasons. First, he was dissatisfied with the failure to divide the colt crops pursuant to the agreement, and secondly, Miller and Oakes

had failed to take the necessary steps to register the colts, thereby breaching their portion of the contract and rendering the colts less valuable. Further, by 1978, the Miller-Oakes partnership had disintegrated. Jackie was no longer residing with Miller and evidently was not a part of his business arrangements. Once Jackie was no longer a part of Miller's business, it was very doubtful that colts born from the breeding arrangements could ever be registered with the AQHA since Miller was suspended from that organization.

Aside from the dispute over the splitting of the partnership colts, Miller also claimed that Watkins had purchased several horses from Miller-Oakes, and that Miller had never been compensated for the horses. Watkins on the other hand alleged accord and satisfaction by reason of payment in full in his answer with respect to each of these horses. In June 1978, Miller approached two brand inspectors alleging that Watkins had stolen these horses. The brand inspectors, together with Miller, approached the county attorneys in Musselshell and Fergus Counties, resulting in the filing of three criminal actions against Watkins for horse theft. Each of the criminal actions was dismissed with prejudice.

As a result of Miller's complaint, Watkins counterclaimed for malicious prosection, libel and slander, requesting actual and punitive damages. In addition, Watkins claimed actual damages for failure to receive his share of the partnership colts, as well as for his expenses and actual damages in care, feeding and breeding of Miller's horses.

I

Was substantial credible evidence presented at trial

to support the findings of fact and conclusions of law?

Miller bases his argument on his contention that he and Watkins "are really two old horse thieves" and that neither can really be believed and that the third principal witness, Jackie Oakes, has an extremely unreliable memory and admits lying to the county attorney of Musselshell County. There was also testimony that some of the bills of sale were prepared as late as 1978 in a motel room.

> "This Court will not substitute its judgment for that of the trier of fact. We will consider only whether substantial credible evidence supports the findings and conclusions. Findings will not be overturned unless there is a clear preponderance of evidence against them, recognizing that evidence may be weak or conflicting, yet still support the findings. [Citation omitted.] The judgment of the trial court is presumed correct, and this Court will draw every legitimate inference to support that presumption." Jensen v. Jensen (1981), ____ Mont. ____, 629 P.2d 765, 768, 38 St.Rep. 927, 930.

In addition, evidence will be viewed in the light most favorable to the prevailing party:

> "When this Court reviews evidence, it will be viewed in the light most favorable to the party who prevailed in the District Court, and the credibility of witnesses and the weight assigned to their testimony is for the District Court in a nonjury trial." Parkhill v. Fuselier (1981), ____ Mont. ____, 632 P.2d 1132, 1135, 38 St.Rep. 1424, 1427.

Rule 52(a), M.R.Civ.P., provides in part:

> "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."

Although there was conflicting testimony, we have reviewed the record and hold that there was sufficient credible evidence to support the findings of the District

-7-

Court both in dismissing the plaintiff's claim and in ruling in favor of the defendant's counterclaim.

## II

Were the elements necessary to prove a malicious prosecution action present?

Watkins' counterclaim requested actual and punitive damages from Miller for the malicious prosection of criminal actions against him. To prove a malicious prosecution action against Miller, Watkins had the burden to show that:

1. A criminal proceeding was instituted or continued by Miller against Watkins;

2. The criminal proceedings were terminated in favor of Watkins;

3. There was an absence of probable cause for the criminal proceedings; and

4. There was malice or a primary purpose other than that of bringing a criminal to justice on the part of Miller. Orser v. State (1978), 178 Mont. 126, 135, 582 P.2d 1227, 1232-1233; W. Prosser, The Law of Torts, § 119 at 835 (4th ed. 1971).

Criminal complaints filed against Watkins were as follows:

1. Musselshell County--three counts of theft (criminal action 1065)

    a. Murrietta Grey

    b. Wicked Felita colt

    c. Black Deckette

2. Musselshell County--one count of theft (criminal action 1077)

    a. Bean's mare

3. Fergus County--four counts of theft:

    a. Twig Deck gelding (sold by Watkins to Brad Hamlett)

    b. Pistol Bar gelding (sold by Watkins to Brad Hamlett)

    c. One gelding sold by Watkins to Oscar Walter

    d. One gelding sold by Watkins to Oscar Walter

## Criminal proceedings instituted or continued by Miller against Watkins.

Miller contends that he did not institute or continue proceedings against Watkins but that he merely gave brand inspectors information in an effort to cooperate with the authorities relative to the investigation and identified animals in possession of third parties which carried his brand. During the trial, Miller admitted going to the Musselshell County attorney and informing him that Watkins had stolen his horses and expecting that Watkins would be charged with theft. Miller also contacted Jack Sedgwick, an investigator for the Montana Department of Livestock, and informed him and the Musselshell County sheriff that Watkins had his mare.

We hold that Miller did institute and continue the criminal charges against Watkins.

## Termination in Watkins' favor.

The next element in a malicious prosection action is termination of the proceedings in favor of the plaintiff. The Musselshell County and Fergus County complaints were dismissed with prejudice for lack of a speedy trial.

Miller contends that this type of dismissal is not in favor of Watkins because it does not reflect his innocence.

In Lachner v. LaCroix (1980), 159 Cal.Rptr. 693, 695, 602 P.2d 393, 395, the California Court stated:

> "It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits. However, termination must _reflect_ on the merits of the underlying action. . . A dismissal for failure to prosecute . . . does reflect on the merits of the action . . . The reflection arises from that natural assumption that one does not simply abandon a meritorious action once instituted." (Underscoring added.)

We agree with the California Court that a dismissal for lack of speedy trial does reflect on the merits of the case and can be considered as a termination in favor of Watkins.

Probable Cause

Probable cause has been defined as "a reasonable ground of suspicion, supported by circumstances sufficient to warrant an ordinary prudent man in believing the party is guilty of the offense. It includes an honest belief in the guilt of the accused, since the reasonable man will not prosecute another whom he does not believe to be guilty." Prosser, § 119 at 841.

During the trial Miller admitted that he sold the Bean's mare and the Twig Deck gelding outright to Watkins. Miller knew that there was no basis for the Fergus County criminal complaint regarding the Twig Deck or for one count of criminal action 1077 regarding Bean's mare in Musselshell County. The other three geldings which comprise the Fergus County criminal action were sold to Watkins by Jackie Oakes. Watkins paid Jackie Oakes $750 for these three geldings and evidence presented at trial indicates that Miller knew about this transaction. Thus, there was no basis for the criminal

action in Fergus County.

With regard to criminal action 1065 in Musselshell County, one count concerned Black Deckette, which Jackie Oakes traded to Watkins, and Miller knew of the trade. Another count in action 1065 concerned the Wicked Felita colt which Watkins took as a partial distribution of a colt crop and Miller received a colt from Toi Twist out of the same transaction. This division was made by Jackie Oakes.

The final count of criminal action 1065 concerned Murrietta Grey. The evidence presented at trial indicated that Bob Miller knew and approved of the trade involving Murrietta Grey. From the testimony presented at trial, the District Court was justified in determining that there was no probable cause for Miller to institute these actions against Watkins, and further, no honest belief by Miller of the guilt of Watkins.

Malice as a Prerequisite

The fourth element necessary in a malicious prosecution action is malice or a primary purpose other than that of bringing an offender to justice. In this case, there was a clear lack of probable cause for criminal proceedings as pointed out in the prior section. Malice can be inferred from want of probable cause. McGuire v. Armitage (1979), ___ Mont. ___, 603 P.2d 253, 255, 36 St.Rep. 2142, 2145. In addition, Miller's testimony indicated that he was aware that one horse had been traded by Jackie Oakes, yet he told the county attorney of Musselshell County that the horse was stolen, fully expecting Watkins to be charged with theft. Sufficient evidence was presented to show malice and to conclude that Miller's intent was not to bring an offender

to justice.

### III

Was evidence presented to support the damage awards?

The judgment of the District Court provides in part:

> "That the Court further finding the plaintiff liable to the defendants in the amount of Twenty-three Thousand and no/100 Dollars ($23,000.00) for actual damages for contract on twenty-three colts, Thirty Thousand and no/100 Dollars ($30,000.00) for actual damages as a result of the malicious prosecution, Twenty-five Thousand and no/100 Dollars ($25,000.00) actual damages for libel and slander, and Fifty Thousand and no/100 Dollars ($50,000.00) punitive damages for intentional utterances; and

> "That the defendants having incurred necessary costs in the prosecution of this lawsuit in the amount of Six Hundred Twenty-seven and 14/100 Dollars ($627.14); and

> "That the defendants being entitled to ten percent (10%) interest per annum upon the total amount of this Judgment, such interest to commence with the date of filing this Judgment, and good cause appearing.

> "NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Judgment be entered for the defendants and against the plaintiff for the sum of One Hundred Twenty-eight Thousand Six Hundred Twenty-seven and 14/100 Dollars ($128,627.14), as set forth above, less $1500.00 that Defendants owe Plaintiff, making the total judgment One Hundred Twenty-seven Thousand, One Hundred Twenty-seven and 14/100 Dollars ($127,127.14)."

Section 27-1-303, MCA, provides: "No person can recover a greater amount for the breach of an obligation than he could have gained by full performance thereof on both sides . . ." Fifteen colts were born as a result of the 1975 breeding as evidenced by the Breeder's Certificates for that particular year introduced into evidence. Finding of Fact No. 22 provided:

-12-

"That there was no documentary evidence introduced into evidence by either side as to the exact number of the colts born as a result of the 1976 or the 1977 breeding. It was evidenced that a ninety-two percent (92%) colt crop would be expected, however, in light of poor range conditions at the Miller ranch, together with improper care of the animals, an eighty percent (80%) colt crop should be the minimum expected. That utilizing the eighty percent (80%) figure, there should have been a total of eleven (11) colts for the 1976 breeding and a total of twenty-four (24) colts for the 1977 breeding. Thus, the sum total of colts for the three-year breeding would be in the number of fifty (50), of which each side would be entitled to a total of twenty-five (25) colts each."

The District Court also found that Watkins had received two of the colts and that the fair market value of a colt registered with the AQHA during the time of the contract was $1,000. We find the award for actual damages on the contract to be proper.

Watkins was awarded $627.14 as necessary costs in prosecution of this lawsuit. Watkins was not specifically awarded attorney fees in either his defense in the civil or criminal actions. Watkins submitted a memorandum of his costs which provided:

1. Clerk of Court, filing of Motion
   to Dismiss                                    $  20.00

2. Judgment                                         10.00

3. Deposition                                      445.00

4. Stenographer's Fee                                3.00

5. Witness fees:

   A. Brad Hamlet                                   88.00
      Two days--$20.00
      Mileage from Sun River, Montana--$68.00

   B. Marge Taylor                                  61.14
      Two days--$20.00
      Mileage from Jordan, Montana--$41.14

TOTAL COSTS AND DISBURSEMENTS                    $627.14

Section 25-10-201, MCA, provides that a party to whom costs are allowed are entitled to include as costs:

> "(1) the legal fees of witnesses, including mileage, or referees and other officers;
>
> "(2) the expenses of taking depositions;
>
> ". . .
>
> "(4) the legal fees paid for filing and recording papers and certified copies thereof necessarily used in the action or on the trial;"

The costs awarded are allowed under section 25-10-201, MCA, and are proper.

Watkins was awarded $30,000 on his counterclaim for malicious prosecution and $25,000 as a result of libelous and defamatory statements. Conclusion of Law 17 awards $55,000 general damages to Watkins for loss of business and damage to reputation. Watkins testified that his business was damaged, that he incurred considerable attorney fees as a result of the criminal proceedings, and that he suffered humiliation and embarrassment as a result of the unfounded criminal prosecutions. Watkins was arrested and required to spend a night in jail. Watkins' son testified as to his father's reputation and questions asked of him by others involved in the horse breeding and trading business after the criminal charges were filed.

In Keller v. Safeway Stores, Inc. (1940), 111 Mont. 28, 41, 108 P.2d 605, 612-613, this Court stated that it would rarely revise damage awards for defamation. "Unless the damages are so unconscionable as to impress the court with its injustice and thereby induce the court to believe that the jury was actuated by passion, prejudice or

partiality, it rarely interferes with the verdict. The question of excessiveness of the verdict is primarily addressed to the discretion of the trial court." While this is not a jury case, the question of the damage award for defamation is a matter of the discretion of the trial court. We do find substantial evidence to sustain the conclusion of the trial court and will therefore not interfere with the decision of the lower court.

Watkins was awarded $50,000 punitive damages for intentional utterances. Punitive or exemplary damages are allowed where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, for the sake of example and by way of punishing the defendant. Section 27-1-221, MCA. Exemplary damages shall be used when the defendant clearly shows that he is deserving of such special treatment and punishment. In Smith v. Krutar (1969), 153 Mont. 325, 457 P.2d 459, this Court indicates that where acts are done willfully and the result amounts to fraud or oppression, punitive damages may be awarded under the statute.

Bill and LaVonne Watkins have been victims of false accusations. The maker of these accusations, Miller, knew each and every one of the accusations to be false at the time he made them. Each and every one of the allegations was made maliciously and viciously. Watkins has been accused of criminal conduct. The allegations made are serious and directly affect his business reputation. These allegations were repeated over a period of three years and continued at the time of trial. The award of punitive damages is meant to make an example and punish a person so

that he will cease this type of conduct in the future.

We find that the facts of this case allow for the awarding of punitive damages.

We affirm.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-16-