No. 00-193

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 64


DOUGLAS L. PLOUFFE and
ROGER F. EREAUX,

      Plaintiffs and Appellants,

  v.

MONTANA DEPARTMENT OF PUBLIC
HEALTH AND HUMAN SERVICES,
ENVIRONMENTAL QUALITY, AND
JOHN DOES 1 THROUGH 20,

      Defendants and Respondents.



APPEAL FROM:    District Court of the Seventeenth Judicial District,
                      In and for the County of Phillips,
                      The Honorable John Warner, Judge presiding.



COUNSEL OF RECORD:

      For Appellants:

            James P. Molloy, Hunt & Molloy, Helena, Montana; Theodore K.
            Thompson, Havre, Montana

      For Respondents:

            Roger T. Witt, Ugrin, Alexander, Zadick & Higgins, Great Falls, Montana


Submitted on Briefs: January 18, 2001

Decided:  April 2, 2002

Filed:

_____
                        Clerk

Justice James C. Nelson delivered the Opinion of the Court.

1¶     Douglas L. Plouffe and Roger F. Ereaux appeal the dismissal by the Seventeenth Judicial District Court of their action for malicious prosecution regarding alleged violations of health and safety regulations at Sleeping Buffalo Hot Springs Resort by the Montana Department of Public Health and Human Services and Department of Environmental Quality. We remand for trial on the merits.

2¶     The two issues raised on appeal are:

3¶     1) Did the attorney representing Plouffe have authority to file a joint Notice of Appeal on behalf of Ereaux following judgment in the consolidated case?

4¶     2) Did the District Court err in dismissing the malicious prosecution claim of Plouffe and Ereaux as a matter of law?

**PROCEDURAL BACKGROUND**

5¶     Douglas L. Plouffe (Plouffe) became a major investor in the Sleeping Buffalo Hot Springs Resort (the Resort) in the late 1980s at the urging of shareholder and manager, Roger F. Ereaux (Ereaux). By 1992, Plouffe had purchased all stock of Sleeping Buffalo Management, Inc., and Ereaux remained involved as the Resort's on-site manager. The Resort, located near Saco, Montana, offers golf, dining, overnight accommodations and public bathing facilities supplied by a natural hot springs. The pools consist of an indoor spa, a large indoor pool, and two outdoor pools, one of which serves as a receiving pool for the water slides. Included among the Resort's facilities are a public water system and

a sewerage collection, treatment and disposal system.

6¶ The Respondents (collectively referred to as "the State") include the Department of Public Health and Human Services (DPHHS), the Department of Environmental Quality (DEQ) and twenty unnamed defendants. Prior to a 1995 reorganization, the Montana Department of Health and Environmental Services (DHES) assumed the regulatory functions of the two named departments.

7¶ Numerous encounters between Plouffe, Ereaux and various State agency personnel occurred from 1989 to 1996 regarding compliance with health and safety regulations in the operation of the Resort. The civil proceedings underlying the malicious prosecution claim commenced with a Complaint against Sleeping Buffalo Management, Inc., filed by a DHES attorney on June 22, 1994. The Complaint alleged failure to submit all required drinking water samples to the State for bacteriological testing; inadequate safety measures, unlawful bacterial levels, low chlorine residuals and lack of water clarity in the swimming pools; and unpermitted discharge of water from the Resort's swimming pools and sewerage lagoon into "state waters." Prior to serving the Complaint, the State urged Plouffe and Ereaux to avoid litigation by signing a Consent Decree that detailed review and compliance procedures for the subsequent operation of the Resort. Over the next 16 months, the State presented three decrees for consideration. Each decree required Plouffe and Ereaux to admit to the allegations of the Complaint and stipulated penalties to be imposed by the State for future violations. The parties reached no agreement and the

3

State served the Complaint in December 1995. On January 17, 1996, the Attorney General's office filed an Amended First Complaint, which added Plouffe and Ereaux, individually, as defendants.

8¶ By the Spring of 1996, Plouffe executed an agreement with Robert Flesche and a group of potential investors to assume management of the Resort, with a one-year option to purchase. In June 1997, one month after the option expired, Flesche signed a Corrective Action Agreement with the State, which purported to address the primary compliance issues raised in the First Amended Complaint. In July 1997, Plouffe and Ereaux resumed primary management of the Resort and the State reopened negotiations with a draft settlement agreement and proposed order for dismissal. Plouffe countered with an alternative agreement calling for the State to pay substantial damages to Sleeping Buffalo Management, Inc., for loss of business and business opportunities attributed to the State-instigated closure of the outdoor swimming pool in 1992 and the negative publicity surrounding the State's civil prosecution for alleged health and safety violations. The State rejected Plouffe's proposal. Plouffe and Ereaux objected to each of the State's proposed settlement agreements, Consent Decrees and corrective action plans because they required Plouffe and Ereaux to admit liability for past regulatory violations.

9¶ In August 1997, the State filed a motion for voluntary dismissal of the First Amended Complaint. Plouffe objected on the grounds that he wanted to disprove the

4

allegations in court. The District Court dismissed the State's action without prejudice on September 17, 1997.

10¶ Thereafter, Plouffe and Ereaux brought separate actions in the District Court against the State. Following summary judgment on some of the theories of relief, the court consolidated the plaintiffs' claims for malicious prosecution. The joined cases proceeded to a jury trial in Phillips County on December 13, 1999. At the close of plaintiffs' evidence, the court granted the State's motion for judgment as a matter of law, from which Plouffe and Ereaux appeal.

## STANDARD OF REVIEW

11¶ The standard of review on appeal from a judgment as a matter of law, pursuant to Rule 50(a), M.R.Civ.P., is to determine whether the nonmoving party could prevail upon any view of the evidence including the legitimate inferences to be drawn therefrom. *Anderson v. Werner Enterprises, Inc.* 1998 MT 333, ¶ 30, 282 Mont. 284, ¶ 30, 972 P.2d 806, ¶ 30 (*citing Cameron v. Mercer,* 1998 MT 134, ¶ 8, 289 Mont. 172, ¶ 8, 960 P.2d 302, ¶ 8). Courts will exercise great self-restraint in interfering with the constitutional right of trial by jury. *Anderson*, ¶ 30. Unless there is a complete absence of any credible evidence in support of the verdict, judgment as a matter of law is improper. *Anderson*, ¶ 30. In reviewing a motion for judgment as a matter of law, we adhere to the following well-established principles:

We consider only the evidence introduced by the party against whom the

5

directed verdict is granted. If that evidence, when viewed in a light most favorable to the party, tends to establish the case made by the party's pleading, we will reverse the directed verdict. The test commonly used to determine if the evidence is legally sufficient to withdraw cases and issues from the jury is whether reasonable persons could draw different conclusions from the evidence.

*Anderson*, ¶ 30 (*citing Riley v. American Honda Motor Co.* (1993), 259 Mont. 128, 131, 856 P.2d 196, 198).

## DISCUSSION

### *Issue 1. Did the attorney representing Plouffe have authority to file a joint Notice of Appeal on behalf of Ereaux following judgment in the consolidated case?*

12¶     The District Court consolidated the separate malicious prosecution actions filed by Ereaux and Plouffe against the State by court order, but separate counsel represented the parties at trial.  The State contends that Ereaux's appeal is defective and must be dismissed because no notice of substitution of counsel was entered before trial counsel for Plouffe, Theodore K. Thompson (Thompson), signed and filed a joint Notice of Appeal on behalf of both appellants.  Attorney James P. Molloy subsequently entered a Notice of Appearance on behalf of both Plouffe and Ereaux.  The State maintains it is entitled to relief from the appeal by Ereaux because Thompson lacked authority to file the appeal.

13¶     Section 37-61-402, MCA, provides that a court, on the motion of either party, may require an attorney of the adverse party to produce and prove the authority under which he appears.  The motion must be made at the earliest practicable time, otherwise the right may be deemed to have been waived.  *Missoula Belt Line Ry. Co. v. Smith* (1920), 58

6

Mont. 432, 442, 193 P. 529, 531. Although an attorney is presumed to have authority until the contrary is shown, the presumption is not conclusive. *Missoula Belt Line Ry. Co.*, 58 Mont. at 442, 193 P. at 531. The challenging party has the burden to make a good faith showing of reasonable cause to doubt an attorney's authority. *Union Bank & Trust Co. of Helena v. Penwell* (1935), 99 Mont. 255, 263, 42 P.2d 457, 461.

14¶ The State did not challenge Thompson's authority to act on behalf of Ereaux when it received the joint Notice of Appeal filed in the District Court on January 26, 2000. The State first raised the issue in its brief on appeal, but neither alleges nor offers evidence of reasonable cause to question Ereaux's authorization of Thompson to file the Notice of Appeal on his behalf. Without a good faith showing to overcome the presumption that Thompson acted with Ereaux's authority, we conclude the State's contention is neither compelling nor timely.

15¶ The joinder of appeals is set forth in Rule 4(b), M.R.App.P., which states in pertinent part:

> If two or more persons are entitled to appeal from a judgment or order of a district court and their interests are such as to make joinder practicable, they may file a joint notice of appeal or may join in appeal after filing separate timely notices of appeal, and they may thereafter proceed on appeal as a single appellant.

The District Court concluded the interests of Plouffe and Ereaux, expressed in separate

malicious prosecution suits against the same defendants, were appropriately joined for trial. Since joinder was not only practicable but court-ordered in this case, we conclude the joint Notice of Appeal filed by Thompson on behalf of both plaintiffs meets the requirements of our rules of appellate procedure.

***Issue 2. Did the District Court err in dismissing the malicious prosecution claim of Plouffe and Ereaux as a matter of law?***

16¶ A malicious prosecution begins in malice, without probable cause to believe the action can succeed, and finally ends in failure. *McGuire v. Armitage* (1979), 184 Mont. 407, 410, 603 P.2d 253, 255. In a civil action for malicious prosecution, the plaintiff's burden at trial is to introduce proof sufficient to allow reasonable jurors to find each of the six following elements:

> (1) a judicial proceeding was commenced and prosecuted against the plaintiff;
> (2) the defendant was responsible for instigating, prosecuting or continuing such proceeding;
> (3) there was a lack of probable cause for the defendant's acts;
> (4) the defendant was actuated by malice;
> (5) the judicial proceeding terminated favorably for plaintiff; and
> (6) the plaintiff suffered damage.

*Vehrs v. Piquette* (1984), 210 Mont. 386, 390, 684 P.2d 476, 478 *(citing Reece v. Pierce Flooring* (1981), 194 Mont. 91, 95, 634 P.2d 640, 642). *See also, Stephens v. Conley* (1914), 48 Mont. 352, 369, 138 P. 189, 193-94. If one of these elements is not proven by *prima facie* evidence, judgment as a matter of law may be entered for the defendant. *Orser v. State* (1978), 178 Mont. 126, 135, 582 P.2d 1227, 1232 (citations omitted).

17¶ The District Court recognized that Plouffe and Ereaux met their burden with

respect to elements one, two and six. However, the court concluded as a matter of law that the plaintiffs failed to establish elements three, four and five--lack of probable cause, malice and favorable termination of the underlying suit. We disagree. Judgment as a matter of law will stand on appeal only when no genuine issue of material fact arises from an examination of the pleadings and evidence presented by the party opposing the verdict, viewed in the most favorable light with all legitimate inferences granted. We remand for trial on the merits, for the reasons set forth below.

*Probable Cause*

18¶ This Court has defined probable cause for prosecution as "reasonable grounds for suspicion, supported by circumstances reasonably strong in themselves to warrant a reasonably prudent and cautious [person] to believe that the accused is guilty of the offense charged." *Reece*, 194 Mont. at 98, 634 P.2d at 643 (*citing Cornner v. Hamilton* (1922), 62 Mont. 239, 243, 204 P. 489, 491). Because probable cause is determined under an objective standard on the basis of the facts known to the party initiating the legal action, we have held the issue must be submitted to the jury for resolution when direct and circumstantial evidence related to the defendant's knowledge is susceptible to different conclusions by reasonable persons. *Reece*, 194 Mont. at 96, 634 P.2d at 643 (*citing Puutio v. Roman* (1926), 76 Mont. 105, 111, 245 P. 523, 524). Only when no evidentiary conflict exists and uncontroverted evidence admits only one conclusion does the existence of probable cause become a question of law. *Reece,* 194 Mont. at 96, 634

9

P.2d at 642.   *See, e.g., Orser*, 178 Mont. 126, 582 P.2d 1227; *3-D Lumber Co. v. Belgrade State Bank* (1971), 157 Mont. 481, 487 P.2d 1136; *Wendel v. Metropolitan Life Insurance Co.* (1928), 83 Mont. 252, 272 P. 245.

19¶   A finding of probable cause to instigate civil litigation or a criminal prosecution is based on the totality of the circumstances.   In *Reece,* a customer who admitted his check was illegal, established probable cause as an issue for jury resolution by presenting evidence that the store personnel failed to fully disclose to the county attorney the true facts and circumstances surrounding the issuance and delivery of the bad check.   *Reece*, 194 Mont. at 98,  634 P.2d at 644.  Accordingly, a party may demonstrate probable cause for part of a claim, while a jury may still reasonably conclude that the party lacked probable cause to prosecute the action itself.

20¶   Lack of probable cause is the gist of a malicious prosecution action.  *McGuire*, 184 Mont. at 411, 603 P.2d at 255 (*citing Wilson v. Gehring* (1968), 152 Mont. 221, 228, 448 P.2d 678, 682).   In reviewing the trial court's judgment as a matter of law,  we examine the factual support for the State's suspicions that Plouffe and Ereaux violated certain health and safety regulations under the totality of circumstances test.   The second inquiry is whether undisputed evidence admits only the conclusion that the State acted upon a reasonable belief that Plouffe and Ereaux were guilty of the offenses charged.

21¶   The State's First Amended Complaint alleged that Plouffe and Ereaux violated the Public Water Supply Act, Title 75, Chapter 6, Montana Code Annotated; the Water

Quality Act, Title 75, Chapter 5; and the provisions for the operation of public swimming pools and bathing places, Title 50, Chapter 53. The State sought injunctive relief to enforce compliance with drinking water sampling requirements, cease wastewater discharge and close the public swimming pools. The First Amended Complaint also stated that Plouffe and Ereaux failed to submit required drinking water samples for periodic bacteriological testing on 14 specific dates between October 1990 and October 1995. The complaint alleged illegal discharge from the Resort's swimming pools and a sewerage lagoon into "state waters" without a permit. The State also asserted that an order by the Phillips County Sanitarian to close the large outdoor pool on May 20, 1992, remained operative despite recision of the order by the Phillips County Health Board on April 26, 1993. The State claimed the hot springs pools did not meet bacteriological standards on seven specified dates and that Plouffe and Ereaux failed to keep daily sanitation records; insure compliance with all swimming pool safety rules; maintain sufficient residual chlorine levels on four specified occasions; ensure adequate water clarity on three occasions; and bring the large pools into compliance with § 50-53-115, MCA, which requires an 8-hour turnover of the entire volume of pool water and that the pools be drained and sanitized every 72 hours.

22¶ In his testimony at trial, Plouffe contested each of the State's allegations in the First Amended Complaint. He asserted that the State's water sampling, collection and testing methods were improper and yielded unreliable results. Although Plouffe

11

admitted he did not submit all required samples for bacteriological testing, he denied that the resort's drinking water system or pools posed a health or safety risk and claimed certain tests conducted by State inspectors did not follow scientifically recognized protocols. Plouffe entered into evidence the treatise, *Standard Methods For the Examination of Water and Wastewater* (15th ed. 1981), to which he referred throughout his testimony. Specifically, Plouffe stated that State inspectors did not adequately flush faucets prior to sample collection in order to avoid bacterial contamination and did not consistently wear sterile gloves when taking samples from the pools. He asserted that tests of swimming pool water for bacteria and residual chlorine are particularly susceptible to inaccurate results when samples are agitated, exposed to sunlight, or held for a number of hours before tests are completed. He maintained that samples were not handled properly by the State and laboratory work did not occur in a timely fashion. In addition, Plouffe claimed the State failed to strain the turbidity caused by minerals suspended in the hot springs water prior to undertaking bacterial counts, which skewed the results. Plouffe further challenged the State's testing procedures with evidence that three pool water samples drawn from a single sterile pitcher yielded widely different bacterial counts from the State's laboratory.

23¶ Plouffe asserted that state and county pool inspectors employed different criteria for testing water clarity in the pools. The county sanitarian required that a six-inch black disc against a white background placed at the deepest point in the pool must be visible

from the side of the pool, while State inspectors required visibility from all points surrounding the pool. Plouffe testified that he was unable to get a final ruling from DEQ on the issue after numerous letters and telephone calls and refused to enter a corrective action agreement until the State clarified the test criteria.

24¶ Plouffe acknowledged numerous improvements in safety measures, signage, personnel training, record-keeping, and general operation of the Resort since the late 1980s. He stated that the Resort, as well as most other natural, flow-through, hot springs pools in Montana, could not comply with water quality regulations until a statutory amendment, specifically § 50-53-115, MCA, increased the allowable turnover time for the complete exchange of pool water from four to eight hours. He maintained the swimming pools at the Resort met the 1995 standards. And, finally, Plouffe testified that the State incorrectly interpreted regulations governing discharges from the Resort's swimming pools and sewerage lagoon. Although discharge permits had been obtained by the Flesche group during their interim management of the Resort, Plouffe argued that no permits were required as a matter of law.

25¶ While conceding all evidence presented by the plaintiffs as true, the District Court noted that Plouffe and Ereaux admitted they did not submit all periodic drinking water samples within required time frames and refused to obtain permits for wastewater discharges from the Resort pools and sewerage treatment lagoon. On the basis of these two regulatory violations, the court concluded that the State had probable cause to initiate

13

litigation against Plouffe, Ereaux and Sleeping Buffalo Management, Inc.

26¶    We note that both admissions by Plouffe and Ereaux involved procedural violations, which do not signify conclusively that a risk to public health and safety existed at the Resort. Under the totality of circumstances test for probable cause in the context of a malicious prosecution, where proof of probable cause for part of a claim does not necessarily support probable cause to prosecute the underlying action, we conclude that reasonable jurors could find that the State lacked a trustworthy factual basis to support the reasonable suspicions of a conscientious and careful person that Plouffe and Ereaux had violated the public health and safety laws as alleged. Accordingly, we hold that the District Court erred in concluding that the evidence admitted of only one conclusion, and in determining the existence of probable cause as a matter of law.

*Malice*

27¶    The District Court found no evidence of malice on the part of the State in the underlying civil action against Plouffe and Ereaux. The court's order stated:

> Now, malice means that . . . the [S]tate of Montana brings an action for a primary purpose other than that of requiring the offender to follow the law in this instance. In other words, there was some other motive for bringing the underlying case by the [S]tate of Montana other than to enforce compliance. Now, this is a motive thing. . . [I]t becomes incumbent on the plaintiffs to prove that the state was out to get them.

14

The court interpreted the malice element of an underlying malicious prosecution to require evidence of intentional ill will on the part of the persons who pursued the litigation.

28¶ Our statutes provide two definitions of malice. Section 1-1-204(3), MCA, describes the state of mind, as follows:

> "Malice" and "maliciously" denote a wish to vex, annoy, or injure another person or an intent to do a wrongful act, established either by proof or presumption of law.

While the above statutory definition imports a requirement that the defendant's subjective state of mind be established by proof or presumption, this Court has consistently held that malice may be inferred when want of probable cause for the underlying action is proven by the facts. *Miller v. Watkins* (1982), 200 Mont. 455, 465, 653 P.2d. 126, 131; *McGuire*, 184 Mont. at 411, 603 P.2d at 255; *Rickman v. Safeway Stores* (1951)*, 124 Mont. 451, 456, 227 P.2d 607, 610; *Wendel*, 83 Mont. at 264, 272 P. at 249; *Cornner*, 62 Mont. at 243, 204 P. at 491; *Jones v. Shannon* (1918), 55 Mont. 225, 233,175 P. 882, 885. The law presumes that a person intends the consequences of his or her voluntary acts, and we have reasoned that a malicious intent to vex, annoy, or injure may be presumed where a prosecution is motivated by "some collateral or private purpose and not to vindicate the law." *Rickman,* 124 Mont. at 456, 227 P.2d at 612 (prosecution for a bad check was malicious when reasonable investigation would have disclosed the check was good). Similarly, in *Miller* we stated that a defendant acts with malice when he or

15

she is motivated by "a primary purpose other than that of bringing an offender to justice." *Miller*, 200 Mont. at 465, 653 P.2d. at 131 (prosecution for horse thievery was malicious when brand inspectors and county attorneys had been misled by lies and partial truths). While an inference of malice from want of probable cause constitutes *prima facie* evidence of malicious prosecution, we note that an inference reveals little about the subjective state of mind of a defendant.

29¶     Plouffe and Ereaux contend the proper standard for a malicious prosecution action is  the statutory definition of "actual malice," which reads:

> A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
>> (a)    deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
>> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

Section 27-1-221(2), MCA.   This definition, presented in the context of statutory standards for punitive damage awards, offers an objective criterion for determining malice based upon a person's deliberate behavior stemming from actual knowledge or intentional disregard for probable injury to another.

30¶    While precedent allows a rebuttable presumption of a malicious state of mind, pursuant to § 1-1-204(3), MCA, upon the finding of want of probable cause for a malicious prosecution, a finding of actual malice, pursuant to § 27-1-221, MCA, entails an independent inquiry as to the defendant's knowledge regarding the probability of

16

injury resulting from the improper prosecution. The defendant's consciousness that the failed litigation would have a high probability of adverse consequences for the plaintiff, of course, does not require injurious intent or motive. Such awareness is equally consistent with indifference toward or disregard for consequences. Indeed, pursuant to § 27-1-221(2), MCA, actual malice can be present in a prosecution where the harmful consequences are unintentional. Consequently, under either statutory definition of malice, the plaintiff is not required to prove the subjective intent of the defendant to establish a *prima facie* case for malicious prosecution.

31¶ The inference of malice does not require proof that the State was "out to get" Plouffe and Ereaux by initiating the underlying suit. In fact, Plouffe and Ereaux may enjoy the rebuttable presumption that the State intended to "vex, annoy, or injure" them if the jury on remand finds an absence of probable cause. That is all that is required to proceed to trial on the merits.

*Favorable Termination of Underlying Action*

32¶ The State moved for voluntary dismissal of the First Amended Complaint and the District Court dismissed the suit without prejudice over Plouffe's objections on September 17, 1997.

33¶ On appeal, the State distinguishes dismissal without prejudice from dismissal with prejudice, arguing that only the latter constitutes a termination favorable to the defendant, akin to a final adjudication adverse to the plaintiff. Since dismissal without prejudice

17

allows a party to sue again on the same cause of action, the State contends the ruling has no bearing on the merits of the underlying action.

34¶    For the termination of the underlying action to be deemed favorable to the defendant, the termination "must reflect on the merits of the underlying action." *Sacco v. High Country Independent Press* (1995), 271 Mont. 209, 245, 896 P.2d 411, 432 (*citing Miller*, 200 Mont. at 463, 653 P.2d at 130).  This Court has recognized "the natural assumption that one does not simply abandon a meritorious action once instituted." *Sacco*, 271 Mont. at 245, 896 P.2d at 432 (failure to prosecute within statute of limitations reflects favorably for defendant);  *Miller*, 200 Mont. at 463, 653 P.2d at 130 (dismissal for lack of speedy trial reflects favorably for defendant).  *See also O'Fallon v. Farmers Ins. Exchange* (1993), 260 Mont. 233, 241, 859 P.2d 1008, 1013  (favorable termination is issue for jury when action dismissed without evidence of settlement by defendant);  *Prosser and Keeton*, Second Restatement of Torts (1976), § 674, comment j ("favorable termination may arise from the withdrawal of the proceedings by the person bringing them").

35¶    The District Court correctly stated that the law in Montana affords a presumption that voluntary dismissal of an action by the plaintiff  reflects favorably for the defendant unless evidence demonstrates the converse.  The court noted that Robert Flesche, the Resort's manager from April 1996 through May 1997, had obtained the disputed wastewater discharge permits and executed a Corrective Action Agreement with the State

18

that outlined procedures for ensuring future compliance with pertinent environmental regulations at the Resort. Consequently, the court concluded that the State chose to discontinue the litigation against Plouffe and Ereaux because it had received substantial compliance with the environmental infractions alleged in the First Amended Complaint.

36¶ Plouffe and Ereaux argue that no change in the Resort's operation explained the State's motion to dismiss. The wastewater discharge permits for the pools and sewerage lagoon issued to Flesche evince no shift in the defendants' position that the law required no such permits. Also, a Corrective Action Agreement signed by Flesche did nothing to bind Plouffe and Ereaux to any course of action. Plouffe testified that the State entered the agreement with Flesche in June 1997 with notice and actual knowledge that the Flesche group's option to purchase had expired and Robert Flesche was no longer involved in Resort management. When the State moved to dismiss the action against Plouffe, Ereaux and Sleeping Buffalo Management, Inc., in August 1997, the defendants had agreed to no corrective action plan, had admitted no wrong-doing, and had paid no fines. Plouffe and Ereaux also introduced evidence that there had been no change in the condition of the pools.

37¶ The evidence presented by Plouffe and Ereaux permit a reasonable inference that the State had achieved regulatory compliance during the time the Flesche group managed the Resort and dropped the suit as moot. However, the same facts also support a reasonable inference that regulatory compliance at the Resort was irrelevant and the State

19

simply abandoned the underlying litigation as meritless. We conclude that the question of favorable termination of the underlying action is an issue for the jury to resolve on remand.

## CONCLUSION

38¶    Judgment as a matter of law averts trial by jury and is proper only in those rare circumstances where undisputed evidence admits of only one conclusion. When all evidence presented by Plouffe and Ereaux is conceded as true, and considered in the most favorable light, with the benefit of all legitimate inferences, the court's burden is great to demonstrate that judgment as a matter of law is proper. While the proceedings to date do not demonstrate guilt or innocence, we conclude the plaintiffs made out a *prima facie* case that warrants jury determination.

39¶    Reversed and remanded for further proceeding consistent with this Opinion.


/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ JIM REGNIER

Justice W. William Leaphart dissenting.

40¶    I dissent. There was no favorable termination of the underlying action.  The Court cites to *Sacco v. High Country Independent Press* (1995), 271 Mont. 209, 245, 896 P.2d 411, 432, and *Miller v. Watkins* (1982), 200 Mont. 455, 463, 653 P.2d 126, 130, in analogizing a dismissal without prejudice to a dismissal for lack of speedy trial or a dismissal due to the bar of the statute of limitations, both of which the Court has held reflect on the merits of the claim. However, in both those instances, further prosecution is barred and there is no possibility of a subsequent and inconsistent result.

41¶    A dismissal without prejudice is not intended to be res judicata of the merits of the controversy.  Black's Law Dictionary 1603 (6th ed. 1990).  A dismissal without prejudice does not amount to a "favorable termination" in the same sense as a dismissal based on the statute of limitations or denial of speedy trial.  Having dismissed without prejudice, the State is not barred from further proceedings. Rather, it is still free to file a new complaint against the defendants and possibly obtain a result favorable to the State.  Such a result would, obviously, be entirely inconsistent with a successful malicious prosecution action by Plouffe and Ereaux.

42¶    In my view, the record supports the District Court finding that the State chose to discontinue the litigation against Plouffe and Ereaux because it had received substantial compliance with the environmental infractions alleged in the amended complaint.

21

I would affirm the District Court's dismissal of the complaint for malicious prosecution.

/S/ W. WILLIAM LEAPHART

Chief Justice Karla M. Gray joins in the dissent of Justice Leaphart.

/S/ KARLA M. GRAY

22