No. 01-090

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 213

ACE LEASING, INC., a Montana corporation,

        Plaintiff and Appellant,

    v.

MARY BOUSTEAD,

        Defendant and Respondent.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                      In and for the County of Gallatin,
                      Honorable Mike Salvagni, Judge Presiding

COUNSEL OF RECORD:

        For Appellant:

        Wayne Jennings, Angel Law Firm, Bozeman, Montana

        For Respondent:

        James D. McKenna, Walsh & McKenna, Bozeman, Montana

                        Submitted on Briefs:  August 2, 2001

                                  Decided:  September 19, 2002

Filed:

_____
                    Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant, Ace Leasing, Inc., appeals from the findings of fact and conclusions of law entered by the Eighteenth Judicial District Court, Gallatin County, holding that material changes in a leasing agreement exonerated Respondent, Mary Boustead, from her obligations as a guarantor for the lease.  We affirm.

¶2     Appellant presents the following issues on appeal:

¶3     **1.    Did the District Court err in its findings of fact regarding ownership of the equipment, and alteration or cancellation of the agreement?**

¶4     **2.    Did the District Court err in its legal conclusion that Boustead was exonerated from liability under the leasing agreement?**

*BACKGROUND*

¶5     Ace Leasing, Inc. (Ace), is a Montana corporation in the business of purchasing and leasing equipment to its customers for business purposes.   Ace does not maintain an inventory of equipment, but rather, agrees to purchase equipment and thereafter to lease the equipment to its customers.

¶6     On April 13, 1998, Ace entered into an agreement entitled "commercial lease" with Advantage Group, Inc., d/b/a Arma Coatings of Montana, a business operated by Tim O'Neill (O'Neill).   The agreement provided that Ace would pay the supplier and retain title in equipment that O'Neill would lease from Ace for use in his startup business applying coatings to truck beds, utility and horse trailers, boats and for other uses.   The agreement also provided that O'Neill would be responsible for ordering the equipment from the supplier "from whom Lessor (Ace) is to purchase the equipment."  The lease further provided that:

2

Comment [COMMENT1]: Trans. at 6

Comment [COMMENT2]: Paragraph 2 of lease agreement

It shall be Lessee's responsibility to order the specified equipment from the supplier and arrange for its installation. Lessee shall provide to Lessor, at the time of ordering, a copy of the purchase order. Lessor shall pay the supplier upon delivery and/or installation of the equipment, provided that the Lessee and supplier have furnished the necessary information to complete the lease and/or security instruments.

¶7 Respondent, Mary Boustead (Boustead), became guarantor of the lease agreement, guaranteeing the performance of O'Neill. Should O'Neill fail to perform, the lease allowed Ace to proceed directly against Boustead without being first required to proceed against O'Neill.

¶8 Ace agreed to fund the lease in the amount of $45,000 and, under the terms of the agreement, O'Neill was to make sixty monthly payments of $995 each, beginning May 15, 1998, equaling a total amount of $59,700. The estimated residual amount to be paid by O'Neill at the end of the lease period if O'Neill wished to own the equipment was $4,600.

¶9 After entering into the agreement, Ace did not make direct payment to the supplier for the equipment ordered by O'Neill, but rather, provided O'Neill with a check in the amount of $45,000, which O'Neill first deposited into his personal checking account and then transferred into a business account for Advantage Group. O'Neill then purchased equipment with the funds, and also reimbursed himself for equipment that he had previously purchased with personal funds. As O'Neill ordered and purchased the equipment directly from the suppliers, none of the purchase orders contained the name of Ace Leasing, Inc. Also, although the lease

3

Comment [COMMENT3]: Trans. at 9

Comment [COMMENT4]: Trans. 59-60.

agreement provided the option for Ace to obtain a secured interest in the equipment, Ace did not exercise this option.

¶10  O'Neill's equipment did not arrive until approximately June 23, 1998, and he failed to make either the May or the June lease payments.  Ace did not immediately demand payment in full after O'Neill missed the May payment, but sent out a standard form letter to O'Neill and to Boustead after the payment was more than ten days late, informing them that the payment had not been made and that it may have been overlooked.  Ace subsequently contacted Boustead on or about June 22, 1998, informing her that neither the May nor the June payment had yet been made and that Ace was considering canceling the agreement.

Comment [COMMENT5]: Trans. 67-68

Comment [COMMENT6]: Trans. at 15

Comment [COMMENT7]: Trans. 106

¶11  Ace then sent a letter dated June 25, 1998, to O'Neill and Boustead stating:

> Your lease . . . is now in default for lack of payments, and is hereby canceled.
> Pursuant to option 10(a), demand is therefore made upon you to make immediate payment of all remaining lease payments and the residual payment, in the sum of $45,750.
>
> In the event that you do not pay the stated sum by 7-6-98, Ace Leasing will take all legal steps to recover the equipment.

¶12  Neither O'Neill nor Boustead made the payment as demanded. Rather, Ace and O'Neill discussed the matter, and O'Neill explained that the late payments were the result of the late arrival of the ordered equipment and that his business would soon be up and running.  Ace then agreed to accept late payments and, on July 14, 1998, Ace accepted from O'Neill an amount totaling three full payments plus late fees.  Neither Ace nor O'Neill informed Boustead

Comment [COMMENT8]: Trans. 17

4

that Ace had agreed to accept payments on the lease agreement subsequent to the cancellation letter. Boustead did not participate in or know that such discussions were taking place and did not know that O'Neill would begin using the new equipment after the lease agreement had been canceled.

¶13  Ace and O'Neill continued discussions, and Ace again accepted a late payment on October 2, 1998, and another on October 23, 1998. Discussions continued through November, but O'Neill was unable to make any further payments. Ace subsequently wrote to Boustead on December 14, 1998, informing her that O'Neill had been consistently late making payments on the lease agreement and had only "made two payments since [Ace] canceled the lease in [its] June 25, 1998 letter." Ace requested that Boustead pay off the lease by December 30, 1998, under her guarantor obligations.

Comment [COMMENT9]: Trans. 19

¶14  Boustead refused to make payments on the lease as she believed that the cancellation letter and acceptance of late payments without her knowledge, as well as the method of purchasing the equipment, constituted a material change in the original agreement by Ace and a material change in her obligations as the guarantor of the agreement.

Comment [COMMENT10]: Trans. 113

¶15  Following a bench trial on May 30, 2000, the District Court entered findings of fact and conclusions of law determining that Boustead was exonerated as the guarantor pursuant to § 28-11-211, MCA, because of material changes in the agreement and material changes in Boustead's obligation as the guarantor. The District Court concluded that the cancellation letter and acceptance of late

payments without Boustead's knowledge constituted a material alteration in the original agreement and in Boustead's obligation thereunder. The District Court also found that Boustead's risk was increased because Ace did not have ownership of the equipment, finding that the transaction between Ace and O'Neill constituted a loan rather than a lease.

*STANDARD OF REVIEW*

¶16 This Court reviews a district court's findings of fact to determine whether they are clearly erroneous and gives due regard to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), M.R.Civ.P.; *Trifad Entertainment v. Anderson*, **2001 MT 227, ¶ 27, 306 Mont. 499, ¶ 27, 36 P.3d 363, ¶ 27 (citation omitted). In determining whether a court's findings of fact are clearly erroneous, we first review the record to see if the findings are supported by substantial evidence. *Trifad*, ¶ 27. If the findings are supported by substantial evidence, we determine if the trial court has misapprehended the effect of the evidence. If substantial evidence exists and the effect of the evidence has not been misapprehended, this Court may nevertheless determine that a finding is clearly erroneous if a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. *Trifad*, ¶ 27. The Court reviews conclusions of law to determine whether the trial judge's interpretation of the law is correct. *Trifad*, ¶ 27.**

*DISCUSSION*

¶17 **1. Did the District Court err in its findings of fact regarding ownership of the equipment, and alteration or cancellation of the agreement?**

**A. Ownership of the Equipment**

¶18　The District Court found that O'Neill owned the equipment rather than Ace, contrary to the express terms of the agreement. The District Court based this finding upon the agreed testimony of the parties that Ace did not purchase any equipment, but merely forwarded $45,000 in funds to O'Neill, who then purchased the equipment in the name of his company, Advantage Group. Additionally, no purchasing documents contained the name of Ace Leasing.

> **Comment [COMMENT11]:** F.O.F. # 5

¶19　Ace argues that the District Court erred regarding ownership for two reasons: the language of the lease agreement and the testimony of Boustead and O'Neill. Ace notes that the lease language provides that "[o]wnership of the equipment shall at all times remain in the Lessor, . . . [and] the equipment is and shall remain the property of the Lessor until payment of the residual by Lessee." Ace argues that no evidence was offered to demonstrate otherwise. Ace further argues that O'Neill and Boustead's testimony also supports the opposite finding–that Ace at all relevant times had and retained ownership of the equipment used in O'Neill's business.

¶20　Ace notes that O'Neill asserted no ownership interest in the equipment, as evidenced by the following answers during cross-examination:

Q.　Whose equipment was it?

A.　In what respect?

Q.　Who owns it?

A.　Under the terms of the lease I would assume that it's Al Geissler's [president of Ace Leasing, Inc.].

7

Q. Ace Leasing. So you simply wrote a check to purchase the equipment, but it was Ace Leasing's money; is that not correct?

A. Yes, for which I'm indebted for it.

Q. And you said some of the equipment you already had before you got any money from Ace Leasing?

A. Yes.

Q. You reimbursed yourself for that money?

A. Yes.

¶21 Ace also points to Boustead's cross-examination testimony wherein Boustead expressed no surprise that O'Neill was not asserting ownership interest in the equipment. Ace claims that neither the testimony nor other evidence explained how title or ownership of the equipment could reside in anyone other than Ace, but rather, demonstrated agreement between the parties that Ace was indeed the owner of the equipment. Ace contends that if both parties agree that Ace owned the equipment, then the transaction was a lease rather than a loan, and Ace thus had the right to repossess the equipment if necessary. Therefore, Ace argues, it was clearly erroneous for the District Court to find that the equipment belonged to O'Neill rather than Ace.

¶22 To support its finding that the equipment belonged to O'Neill rather than Ace, the District Court had before it the testimony of Al Geissler, O'Neill, and Boustead, and the purchase orders reflecting payment by O'Neill rather than Ace. Geissler, the president of Ace, testified that a reasonable person looking at the documentary evidence would conclude that the purchaser of the

8

equipment was O'Neill rather than Ace. O'Neill testified consistently with Geissler:

> Q. Was Ace Leasing, Inc.'s name ever on any of the documents that could be . . . that could be used as evidence of ownership of this equipment?
> A. Other than the lease itself?
>
> Q. Other than this lease we're looking at. What about purchase orders?
>
> A. No.
>
> Q. What about invoices?
>
> A. No.
>
> Q. What about canceled checks you used to pay for the equipment?
>
> A. No.
>
> Q. Whose name was on all of those documents that I've just mentioned?
>
> A. It would have been the Advantage Group, d/b/a Arma Coatings of Montana, probably my own signature.

¶23 O'Neill then testified that he received a check in the amount of $45,000 from Ace, and that, hypothetically, he could have used the money to purchase anything other than the business equipment. Further, the documentary evidence clearly demonstrates that O'Neill used the money to purchase the business equipment in the name of his own company and personally signed the checks, purchase orders, and invoices. Ace's name appeared nowhere on any of the purchasing documents.

Comment [COMMENT12]: Trans. p. 60-61

¶24 The purchase of the equipment in the instant matter is governed by § 30-2-101, et seq., MCA, Montana's statutory provisions of the Uniform Commercial Code (UCC) covering transactions in goods. The transfer of title in goods is governed

9

by § 30-2-401, et seq., MCA. Under this statutory framework, unless the agreement explicitly provides otherwise, the title of goods passes to the buyer at the "time and place" at which the seller completes performance with reference to physical delivery of the goods. Section 30-2-401(2), MCA. As with many provisions under the UCC, the effect of the provisions can be varied by agreement between the parties. Section 30-1-102(3), MCA. We recognize, therefore, that parties can explicitly agree that title will pass in a manner other than that provided in § 30-2-401, et seq., MCA.

¶25 In the instant matter, the agreement between Ace and O'Neill did not explicitly provide an alternative method for the transfer of title different from the default provision passing title when seller completed performance by making physical delivery of the equipment. Arguably, the agreement implicitly provided an alternative method to transfer title from the seller to buyer by its provision that Ace would be the purchaser of the equipment subsequent to delivery and/or installation at O'Neill's place of business and that Ace would retain ownership. This is reflected in the above quoted lease provision providing in part: "Lessor shall pay the supplier upon delivery and/or installation of the equipment, provided that the Lessee and supplier have furnished the necessary information to complete the lease and/or security instruments."

¶26 However, the question of whether the above lease provision "explicitly provides" an alternative method to transfer title is

10

immaterial as the facts establish that neither Ace nor O'Neill's actions conformed to the purchase provision of the agreement. Thus, even if the agreement satisfied the "explicitly provides otherwise" requirement to vary from the default UCC provisions, neither party acted in accordance with the agreement. Instead of Ace purchasing the equipment to effectuate transfer and receipt of title, O'Neill purchased the equipment with a combination of his own funds and unfettered funds from Ace, thus defeating any explicit title transfer variance from the default provisions of the UCC. Consequently, as the purchaser, O'Neill obtained title pursuant to § 30-2-401(2), MCA, upon the seller tendering delivery of the equipment to O'Neill.

¶27 The UCC defines "lease" as a transfer of the right of possession and use of goods for a term in return for consideration. It defines "lessor" as one who transfers the right of possession and use of goods under a lease. Sections 30-2A-103(j) and (p), MCA. A lessor cannot transfer the right of possession of property unless the lessor first has title to the property. As a consequence of Ace failing to obtain title by acting in conformance with the agreement, neither could Ace assume the role of lessor and, while retaining title and ownership, transfer to O'Neill merely the right of possession and use of the equipment. Thus, absent the proper obtaining of title by Ace, the transaction effectively became a loan agreement between the parties with O'Neill holding title to the equipment according to the default provisions of the UCC.

11

¶28  We conclude, therefore, that under the foregoing law, the evidence presented to the District Court supports its finding that O'Neill rather than Ace owned the equipment.  Before it was substantial evidence, testimonial and documentary, that O'Neill was the sole purchaser of the equipment in his own name, purchased with unfettered funds provided by Ace, contrary to the agreement's requirements that Ace would purchase the equipment by paying the supplier directly, retain title, and/or complete security instruments to protect its interest.  Ace failed to comply with these requirements.  We therefore hold that the District Court did not err in finding that O'Neill owned the equipment.

**B.    Cancellation and Alteration of the Agreement**

¶29  Ace argues that the District Court erred in concluding that its actions constituted an alteration of the lease agreement.  The undisputed facts show that Ace sent, and O'Neill and Boustead received, the June 25, 1998, cancellation letter, which stated unequivocally that the lease was in default for lack of payment and thereby canceled.  The letter demanded payment in full by July 6, 1998, or Ace would take all legal steps necessary to recover the equipment.  It is also undisputed that Ace did not take any legal action when payment was not made by July 6, 1998.  Rather, Ace entered into discussions with O'Neill and agreed to accept a payment from O'Neill on July 14, 1998, totaling three monthly payments under the lease agreement.  Neither Ace nor O'Neill informed Boustead prior to July 14 that Ace intended to accept late payments, nor was she informed that the lease agreement was no

12

longer considered canceled by either Ace and O'Neill. Ace again accepted a payment from O'Neill in September and two more payments in October without Boustead's knowledge, and also continued discussions with O'Neill into November regarding the possibility of future payments.

¶30 The District Court concluded that the foregoing undisputed facts, in addition to the circumstances surrounding the purchase of the equipment, constituted material alterations of Boustead's original obligation and material alterations in the original lease agreement.

¶31 Ace argues that this conclusion is error as no evidence was presented to demonstrate the existence of a new agreement subsequent to the June 25, 1998, cancellation letter. Ace notes that no evidence was offered showing additional consideration or showing a valid and binding new agreement, nor did the evidence reveal additional terms or new parties or any different amounts owed. Ace contends that the evidence merely demonstrated an acceptance of late payments under the original agreement, a circumstance provided for within the lease agreement and an event that cannot be said to constitute the basis of a new agreement. Ace adds that any modification subsequent to the cancellation letter, even if it had indeed been agreed upon, would have been oral rather than written, and therefore invalid pursuant to § 28-2-1602, MCA, as an unexecuted oral agreement.

¶32 We agree with Ace that evidence of consideration, of additional parties, of different amounts, or of a written

13

modification of the original agreement is lacking, and consequently, that there is no evidence of a new and valid agreement. We do not agree, however, that the District Court lacked substantial evidence to conclude that the actions of Ace constituted a material alteration of the original lease agreement that could affect Boustead's interest.

¶33 Clearly, Ace gave notice of cancellation of the original lease agreement, as evidenced in its June 25, 1998, letter. After its deadline for paying off the lease had passed, Ace entered into discussions with O'Neill, without the knowledge of Boustead, and agreed to continue accepting payments under the agreement. Further, as demonstrated earlier, Ace also failed to comply with the terms of the lease requiring it to purchase the equipment, retain ownership and/or secure its interest. Based on the foregoing, we hold that the District Court had substantial evidence to conclude that the actions of Ace constituted material alterations in the original lease agreement as affecting Boustead.

¶34 **2.    Did the District Court err in its legal conclusion that Boustead was exonerated from liability under the leasing agreement?**

¶35 Section 28-11-211, MCA (2001), provides:

> A guarantor is exonerated . . . if by any act of the creditor without the consent of the guarantor the original obligation of the principal is altered in any respect or the remedies or rights of the creditor against the principal in respect thereto are in any way impaired or suspended.

¶36 The District Court exonerated Boustead pursuant to the above statute, concluding that ownership of the equipment by O'Neill,

14

rather than Ace, as well as the notice of cancellation and acceptance of late payments, constituted material alterations of Boustead's original obligations, thereby increasing Boustead's risk beyond that which she originally agreed. In so concluding, the District Court relied on our language in *United States Building & Loan Ass'n v. Burns* (1931), 90 Mont. 402, 422, 4 P.2d 703, 708, stating:

> If the creditor without the consent of the surety does any act which, in contemplation of law, *alters the surety's liability, increases his risk*, or deprives him even for a moment of the right to pay the debt and assume the position of the creditor, or of his right to seek indemnity, the surety is thereby discharged and the fact that the surety may not have been actually injured is immaterial. [Emphasis supplied.]

¶37 The current version of § 28-11-211, MCA, was enacted in 1895 and has never been amended. In *Burns*, we discharged the obligations of a surety under a mortgage where the creditor and principal, without the knowledge of the surety, altered the original mortgage agreement with a separate, valid agreement.

¶38 In so holding, we found persuasive the following language of the supreme court of South Dakota construing a statute identical to § 28-11-211, MCA: "Generally a surety is discharged if the creditor deprives him of any right which he would have against the principal, even though he be benefitted, whether such injury arises from some positive act, or omitting to do something which it was

15

the duty of the creditor to perform." *Burns*, 90 Mont. at 423, 4 P.2d at 708-09 (citing *Hampe v. Manke* (1912), 28 S.D. 501, 507, 134 N.W. 60, 62 (citations omitted)).

¶39 Ace argues that the manner of purchase of the equipment cannot be grounds for Boustead's exoneration since O'Neill used the $45,000 for the intended equipment rather than expending it on improper expenditures, and because O'Neill's testimony demonstrated that he did not feel free to sell the equipment. Therefore, Ace contends, its actions did not increase the risk to Boustead.

¶40 Ace further argues that mere delay in exercising its remedy for O'Neill's default is not grounds for exoneration. Ace argues that it did nothing more than to begin exercising one of its remedies (cancellation), without carrying that remedy through to its conclusion until after accepting a number of late payments according to the original contract. Ace points to § 28-11-213, MCA, which provides that "[m]ere delay on the part of a creditor to proceed against the principal or to enforce any other remedy does not exonerate a guarantor." Mere delay, Ace claims, formed part of the belief by the District Court that a new agreement had been formed and that Boustead should be exonerated.

¶41 Finally, Ace contends that acceptance of the late payments constituted mitigation of damages after O'Neill's default, an obligation placed upon Ace under Montana law requiring a non-defaulting party to act in such a manner so as not to unnecessarily enlarge damages caused by default.

16

¶42  Based upon the above arguments, in addition to denying the formation of any subsequent valid agreement which altered the original, Ace argues that there was never a moment when Boustead lost the ability to pay the debt to Ace and assume the position of the creditor.

¶43  We agree that mere delay of the creditor in exercising its remedy is not grounds for exoneration and that Montana law requires mitigation after default.  We further agree that no subsequent, valid agreement has been demonstrated and that Boustead could still have paid the debt and assumed the position of creditor.  But such arguments miss the critical point here.

¶44  Section 28-11-211, MCA, protects the remedies and rights of the guarantor against the principal, in this case the lessee, by preventing the creditor from impairing or suspending its own rights and remedies against the principal, thereby altering the risk agreed to by the guarantor.  This is because a guarantor is in no better position and has no greater rights than that of the creditor.  See *Burns*, 90 Mont. at 422, 4 P.2d at 708; *Moore v. White* (Ok. 1979), 603 P.2d 1119, 1121.  Thus, when a creditor impairs or suspends its own rights and remedies under an agreement, it also impairs or suspends the rights and remedies of the guarantor.

¶45  In the instant case, Ace was to retain ownership of the equipment under the agreement and/or secure its interest, thereby retaining the right and remedy of non-judicial repossession of the equipment upon default.  Because Ace did not retain ownership or

17

properly secure the equipment, then neither could Boustead, by paying the debt and substituting herself as creditor, claim title or ownership of the equipment.

¶46 It is clear, therefore, that Ace impaired or suspended its rights and remedies against O'Neill and, without Boustead's consent, impaired or suspended Boustead's rights as well. This is sufficient to exonerate Boustead as the guarantor pursuant to § 28-11-211, MCA, as it deprived Boustead of her rights and remedies as owner or a secured creditor upon her payment of the debt, a right provided to her under the agreement. Boustead, therefore, no longer retained the bargained-for means of preventing the loss she had guaranteed by way of non-judicial repossession of the equipment, thereby altering her liability and increasing her risk. "[A] surety is discharged if the creditor deprives him of any right he would have against the principal . . . ." *Burns*, 90 Mont. at 423, 4 P.2d at 708. Boustead was so deprived herein.

¶47 Statutory language must be construed according to its plain meaning and, if the language is clear and unambiguous, no further interpretation is required. *Infinity Ins. Co. v. Dodson,* 2000 MT 287, ¶ 46, 302 Mont. 209, ¶ 46, 14 P.3d 487, ¶ 46. Ace argues that the District Court erred in interpreting § 28-11-211, MCA, because no actions of Ace deprived Boustead of her ability to pay the debt and assume the position of creditor. We conclude that Ace's actions materially impaired Boustead's rights and remedies, and according to the statute's plain meaning, exonerated Boustead as the guarantor of the lease agreement.

18

¶48   The decision of the District Court is affirmed.


                                    /S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER

Justice Terry N. Trieweiler dissenting.

¶49  I dissent from the majority Opinion.

¶50  The majority Opinion exalts form over substance to determine title to the leased property contrary to the written terms of the parties' contract and the testimony of the only two parties capable of claiming title.  Based on the record, I would conclude that there was no material alteration to the parties' agreement nor were the guarantor's remedies impaired in violation of § 28-11-211, MCA.  Therefore, I would conclude that the District Court erred and reverse the judgment of the District Court.

¶51  The parties agreed that Advantage Group would order equipment for which Ace Leasing would pay, that Ace Leasing would retain title to the equipment and that Advantage  Group would make lease payments to Ace Leasing.  The parties' agreement also provided that in the event payments were not made on schedule, Ace Leasing had certain remedies which it could but need not enforce and that if it did not enforce its right to declare the agreement in default, it would be entitled to a late charge of $15 per month.

¶52 Advantage Group did order equipment from the supplier and apparently, for convenience sake, paid for some of it.  Ace then sent the money with which Advantage Group paid the balance due for the equipment and reimbursed itself for the amount it had previously paid.  There is nothing about this arrangement that changed the parties' agreement that Ace would own the equipment. Tim O'Neill, on behalf of Advantage, testified that Ace owned the equipment.  Al Geissler, on behalf of Ace Leasing, testified that

20

Ace owned the equipment. The parties' contract provided that Ace owned the equipment and no one else was in a position to claim title to the equipment. There was no written document of title and there were no security documents pursuant to Article IX of the Uniform Commercial Code because there was nothing to secure. Ace owned the property.

¶53 The only evidence relied on by the majority to affirm the District Court's finding that Advantage owned the property was the paperwork which resulted from transactions between Advantage and the suppliers from whom the property was purchased. However, invoices and bills of sale do not establish title. The contract between the parties and their stated intentions determine title.

¶54 The majority notes in ¶ 9 that Ace did not obtain a security interest in the property. However, that fact is of no significance. There was nothing to secure. It was always the parties' intention that Ace would own the property. The only departure from what was originally agreed upon was that instead of Ace paying the supplier directly, it forwarded the money to Advantage which then paid the supplier. The difference was merely a matter of form – not of substance. It was not a material alteration of the parties' agreement.

¶55 The majority's discussion in ¶¶ 24 to 27 about the affect of the UCC on determination of title is a mere afterthought which was neither discussed by either party nor relied on by the District Court, and is an effort to justify the erroneous conclusion already reached by the majority. Furthermore, it was not previously

21

discussed nor relied on for good reason. Section 30-2-401(2), MCA, has nothing to do with the arrangement between Ace and O'Neill. Its purpose is to establish the respective rights of the seller and the buyer. Here there is no dispute between the seller and the buyer. The issue is "who was the buyer?" The answer, based on the undisputed evidence, is that Ace was the buyer because by agreement between Ace and O'Neill, Ace advanced money to buy the equipment which, pursuant to that agreement, it then owned. Everything else said on the subject is superfluous rhetoric to justify the majority's result.

¶56 The only other basis for the District Court's decision was its finding that by accepting late payments from Advantage, Ace Leasing also altered the terms of its lease agreement and that that somehow was to Boustead's disadvantage. Apparently, the majority does not base its Opinion on that finding. However, it is worth noting that neither was that finding correct.

¶57 The lease agreement provided in Paragraph 10 for Ace's remedies upon default by Advantage. Importantly, the agreement provided that "[a]ny failure by Lessor to exercise any right set forth in this lease, or otherwise, shall not constitute a waiver of that right at any time." The contract clearly also anticipated that the lessor could decline to exercise its right to declare the contract in default and in the alternative do exactly what was done by Ace in this case. Paragraph 15 provided as follows:

> In the event Lessee fails to pay when due any part to the rent herein reserved, . . . and the Lessor has not exercised any of its other rights pursuant to paragraph 10 within ten (10) days after the due date thereof,

22

> Lessee shall pay to the Lessor a late charge of fifteen
> (15) dollars for each month or part thereof for which the
> rent or other sum shall be delinquent.

¶58 Not only was Ace in complete compliance with the original terms of the agreement when it chose not to exercise its right to terminate the contract for Advantage's late payment, it was to Boustead's advantage that Ace actually collected about $4,500 from Advantage. That was $4,500 that Boustead did not have to pay once Advantage was finally declared in default.

¶59 Although I have no quarrel with the District Court's nor this Court's interpretation of § 28-11-211, MCA, I would conclude that there have been no facts proven in this case which would warrant its application. I would conclude that there was no evidence that the original obligation of the principal was altered in any respect or that the remedies of the creditor were in any way impaired with regard to the original agreement.

¶60 Contrary to the majority Opinion, Ace did not agree to secure its ownership interest pursuant to Article IX of the Uniform Commercial Code. I do not know of any way it could have secured property that it already owned. Therefore, Boustead could not have been disadvantaged by its failure to do so and, contrary to the majority's conclusion, she remained at all times in the same position she bargained for when she signed the original guarantee agreement.

¶61 For these reasons, I dissent from the majority Opinion.

/S/ TERRY N. TRIEWEILER

23