No. 01-534

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 287

KIMBERLI McGRANE BEAVER,

      Plaintiff and Appellant,

   v.

MONTANA DEPARTMENT OF NATURAL
RESOURCES AND CONSERVATION, and
MICHAEL J. NESS,

      Defendants and Respondents.

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. ADV-99-01,
                Honorable Dorothy McCarter, Judge Presiding

COUNSEL OF RECORD:

      For Appellant:

            James P. Reynolds, Reynolds, Motl and Sherwood, P.L.L.P.,
            Helena, Montana

      For Respondents:

            Donald MacIntyre and Anne W. Yates, Department of Natural Resources
            and Conservation, Helena, Montana

            Edmund F. Sheehy, Jr., Cannon and Sheehy, Helena, Montana

                    Submitted on Briefs:  March 21, 2002

                              Decided:  October 14, 2003

Filed:

                              Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     The plaintiff, Kimberli Beaver (Beaver), brought this action in the First Judicial District Court, Lewis and Clark County. The District Court, sitting without a jury, entered Findings of Fact and Conclusions of Law in favor of defendant Montana Department of Natural Resources and Conservation (DNRC) on the issues relating to sexual and marital status discrimination and employment retaliation; in favor of Beaver on the issues relating to civil assault and battery; and in favor of defendant Michael J. Ness (Ness) on the issue of punitive damages. From these Findings of Fact and Conclusions of Law, Beaver now appeals. We affirm in part, reverse in part, and remand.

¶2     Beaver raises the following issues for review:

¶3     1. Did the District Court err when it determined that the single incident of sexual assault by Ness did not constitute sexual harassment?

¶4     2. Did the District Court err when it determined that DNRC was not vicariously liable for Ness's actions when he sexually assaulted Beaver?

¶5     3. Did the District Court err when it determined that DNRC did not engage in marital discrimination when it assigned Beaver to a six-month rather than an eight-month position?

¶6     4. Did the District Court err when it determined that DNRC did not retaliate against Beaver for filing a claim of discrimination when it assigned her to a six-month rather than an eight-month position?

¶7     5. Did the District Court err when it determined that Beaver was not entitled to punitive damages from Ness?

¶8     6. Were the compensatory damages awarded by the District Court incomplete and inadequate?

*BACKGROUND*

¶9     Kimberli Beaver was employed by DNRC as a seasonal wild lands firefighter from 1990 through the time of trial in October 2000.  In 1994, the time at issue in this case, Ness was employed by DNRC as a unit fire supervisor and was Beaver's supervisor.  Beaver was unmarried but engaged at the time of the incident on September 15, 1994, and until that time, Ness and Beaver had a pleasant working relationship.

¶10    On Wednesday, September 14, 1994, Ness asked Beaver to accompany him the next day to Meagher County to help him complete some fire-related contracts.  Beaver agreed to go, but expected to return to Helena that same day and was unprepared to spend the night away from home.  The two of them left Helena on Thursday morning, September 15, 1994, and drove to White Sulpher Springs in Ness's pickup.  After working all day, they still had not completed all of the contracts and, shortly before 5:00 p.m., Ness mentioned the possibility that they spend the night and finish completing the contracts the next day.  Beaver objected to spending the night and told Ness that she needed to be home the next day to help her mother with her day care business.

¶11    Shortly after 7:00 p.m. that same evening, Ness drove to Ringling to get some contracts signed while Beaver remained in White Sulphur Springs.  When Ness had not returned by 8:00 p.m., Beaver called home to inform her parents and fiancé that she was still in White Sulphur Springs and would be home late.  However, after Ness returned to White Sulphur Springs, at approximately 8:30 p.m., he informed Beaver that they would be spending the night in order to finish their work the next morning.  Ness also informed Beaver

3

that he had already checked into a single room at the Tenderfoot Motel that had two single beds and, according to Beaver's testimony, Ness told her that it was the only room available.

¶12   Although Beaver suggested that the sheriff's office could complete the remaining contract work, Ness disregarded the suggestion, and the two drove to the Tenderfoot Motel where they went to the room that Ness had previously reserved.  Ness left the room for a short time so that Beaver could make some phone calls.  When he returned, he informed Beaver that another room had become available, and, if she wanted her own room she would have to pay for it.  Beaver decided to stay in the room with Ness as, up to this point, Ness had not acted inappropriately toward Beaver and she trusted him.

¶13   Thereafter, Beaver and Ness drove to the store and purchased some beer and snacks and then returned to the motel room and watched television, each person sitting on his or her own bed.  Neither drank more than one-half bottle of beer.

¶14   After watching television for some time, Beaver got up to turn off the lights to go to bed.  Neither she nor Ness got undressed.  Ness then asked Beaver whether she wanted a "Chinese foot massage."  Beaver said no.  Ness, however, went over to Beaver's bed and started rubbing her foot.  Beaver pulled her foot away and again declined Ness's offer for the foot massage.  Ness then reached for her other foot, which Beaver immediately pulled away.  After Ness repeatedly attempted to reach for Beaver's feet, Beaver sat up in an attempt to get out of the situation.  After she sat up, Ness then reached over and started rubbing her shoulders and attempted to stick his hands underneath the back of her shirt,

4

asking if she wanted her back rubbed. Beaver answered no, and told Ness that she was tired and was going to go to bed.

¶15 At that point, Ness got up and walked over to the television and started flipping through the channels. Beaver momentarily got up from the bed, and, as she was preparing to lie down to go to sleep, Ness again approached her. When Beaver turned around, Ness put his arms around her and forced her down on the bed, lying on top of her so that she was unable to free herself. Ness attempted to kiss Beaver. She turned her head to the opposite side, repeatedly telling Ness that he needed to get up and go to his own bed. Ness, however, kept pressing himself against Beaver and, after Beaver repeatedly told him to stop and to go to his own bed, Ness asked Beaver if he could climax first and, although she continued to object and did not reciprocate any sexual activity, Ness kept pressing himself against her until he achieved climax. Afterwards, he rolled over on the right side of Beaver, laid his head on the pillow and said he was going to cry. However, he continued trying to stick his hand on Beaver's inner thigh as Beaver continued to tell him that he needed to go to his own bed. Ness thereafter got up and went to his own bed.

¶16 Nothing further occurred during the evening, and the next morning, as both were about to leave the room, Ness came up behind Beaver and reached around her, hugging her and telling her that it felt good to give her a hug as a friend. Ness and Beaver then left the motel and drove to the sheriff's office, where they determined that they were unable to complete any more of the contracts. They then arranged for the sheriff's office to complete the contract work as Beaver has suggested the previous afternoon and drove back to Helena.

¶17    Upon returning to Helena, Beaver did not immediately tell anyone at DNRC what had happened. She completed her timesheet, drove home to rest and later reported to her other job with the school district selling tickets to sporting events. At that time, Beaver shared with her co-worker at the school district, also a seasonal employee with DNRC, what had happened with Ness and was advised to report it. On the Monday following the incident, Beaver reported the incident to Meagher County Sheriff Rick Seidletz, and charges were thereafter filed against Ness who was later convicted by a jury of the offense of sexual assault. That same Monday, Beaver filed a sexual harassment complaint with DNRC and reported the incident to Greg Morris, Ness's direct supervisor, who then told Mark Ahner, the area manager. When Ahner talked to Ness, Ness stated "I figured this might happen," and did not deny the incident. Ahner also contacted Gary Willis, the personnel director for DNRC, and told Beaver that she would not have to have any more contact with Ness. Beaver later filed a complaint against Ness and DNRC with the Human Rights Commission, alleging sexual harassment.

¶18    After reporting the incident to Greg Morris, Beaver had no more contact with Ness, who was suspended by Mark Ahner without pay. Ahner and Willis eventually recommended Ness's termination and Arthur Clinch, the Director at DNRC, agreed. Ness resigned on October 31, 1994, while he was still on suspension.

¶19    Beaver subsequently obtained psychological counseling as a result of Ness's assault and was diagnosed with post-traumatic stress disorder, and, by the time of trial, had incurred

therapy expenses in the amount of $3,095 and expected to incur further therapy expenses in the amount of $1,000.

¶20    In 1995, Morris, the Area Fire Program Manager, and Ahner made a decision to restructure the seasonal positions at DNRC, eliminating the three temporary seasonal positions held by Beaver and two of her seasonal co-workers, Ed Tovey and Butch Kroll, and creating three permanent seasonal positions: two eight-month positions and one six-month position. Morris delegated the recommendation of the personnel to fill these positions to Rick Grady, Beaver's new supervisor after the suspension of Ness.

¶21    In September 1995, Grady recommended to Ahner that Tovey and Kroll be assigned the eight-month positions and that Beaver be assigned to the six-month position. Ahner followed Grady's suggestion and assigned the positions accordingly.

¶22    Prior to the reassignment, Tovey, Kroll and Beaver had worked the same amount of time each year in their seasonal positions: approximately 65-71 core days in the summer months and "discretionary" hours before and after the summer fire season. Thus, although the three employees generally worked for eight to nine months, from March until November each year, only the core days were guaranteed. Additional days were worked at the discretion of DNRC. The new positions guaranteed all three of them more hours with the additional benefit of no longer having to cash out their annual and sick leave at the end of each season. However, when Beaver asked Grady why she was given the six-month position, Grady told her that she did not need to worry because she had recently been married and had a new husband to support her.

¶23 Beaver thereafter filed a complaint in the District Court to recover actual and punitive damages for sex and marital discrimination, discriminatory retaliation and civil assault and battery. In her complaint, Beaver did not challenge the selection of Tovey, who had over twenty-six years of firefighting experience, but challenged Kroll's selection for an eight-month position. Beaver claimed that the decision to place her in the six-month rather than the eight-month position was arbitrary and retaliatory for her filing a complaint against DNRC before the Human Rights Commission.

¶24 In its findings of fact and conclusions of law, the District Court disagreed with Beaver and concluded that the evidence presented at trial did not establish that Beaver's assignment to the six-month position was arbitrary or retaliatory. The Court concluded that Tovey and Kroll both had more total firefighting experience than Beaver and that the decision to assign Beaver to the six-month position was based on her experience and not because she filed a complaint against the DNRC.

¶25 The District Court further concluded that Beaver was unable to prevail on her claim of discrimination on the basis of a hostile work environment because she failed to prove that the single incident of sexual harassment, which took place away from the normal workplace, was so severe or pervasive as to alter the conditions of her employment and thus create an abusive working environment. The District Court concluded that DNRC took immediate action to protect Beaver and to prevent further misconduct from Ness. The District Court thus ultimately concluded that Ness's conduct did not create a hostile working environment

and that DNRC was not liable under the Montana Human Rights Act, the Government Code of Fair Practices nor Title VII of the Civil Rights Act of 1964.

¶26 From these findings of fact and conclusions Beaver now appeals.

*STANDARD OF REVIEW*

¶27 This Court reviews a district court's findings of fact to determine whether they are clearly erroneous and gives due regard to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), M.R.Civ.P.; *Ace Leasing, Inc. v. Boustead*, 2002 MT 213, ¶ 16, 311 Mont. 285, ¶ 16, 55 P.3d 371, ¶ 16 (citation omitted). In determining whether a court's findings of fact are clearly erroneous, we first review the record to see if the findings are supported by substantial evidence. *Ace Leasing*, ¶ 16. If the findings are supported by substantial evidence, we determine if the trial court has misapprehended the effect of the evidence. If substantial evidence exists and the effect of the evidence has not been misapprehended, this Court may nevertheless determine that a finding is clearly erroneous if a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. *Ace Leasing*, ¶ 16.

*ISSUE I*

¶28 *Did the District Court err when it determined that the single incident of sexual assault by Ness did not constitute sexual harassment?*

¶29 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is well established that there

9

are two forms of sexual harassment that violate Title VII's prohibition against workplace discrimination: (1) quid pro quo; and (2) hostile work environment harassment. *Tomka v. The Seiler Corporation* (2nd Cir. 1995), 66 F.3d 1295, 1304-05 (citing *Meritor Savings Bank v. Vinson* (1986), 477 U.S. 57, 64-65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49, 58); *also see Brooks v. City of San Mateo* (9th Cir. 2000), 229 F.3d 917, 923 ("Sexual harassment is a species of gender discrimination: Harassing an employee on account of sex is, conceptually, the same as refusing to hire on account of sex, or paying less for the same work, or imposing more onerous duties for the same pay").

¶30    Workplace sexual misconduct constitutes prohibited "sexual harassment" where "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment . . . . Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404-05, 91 L.Ed.2d at 58-59; *also see* 29 CFR § 1604.11(a)(3) (internal quotations omitted) (citations omitted). To be actionable, sexual harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60 (citation omitted).

¶31    To be sufficiently severe or pervasive to violate Title VII and establish a claim, the misconduct must create a working environment which is both objectively and subjectively offensive. In other words, the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact perceived as hostile and abusive. *Harris*

10

*v. Forklift Systems, Inc.* (1993), 510 U.S. 17, 21-22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302; *also see Faragher v. City of Boca Raton* (1998), 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, 676 ("[A] sexually objectionable environment must be both objectively and subjectively offensive . . ."). *Faragher* further instructed courts "to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88, 118 S.Ct. at 2283, 141 L.Ed.2d at 676.

¶32 In the instant case, the District Court, citing to *Faragher*, concluded that Ness's sexual assault of Beaver did not create a hostile work environment, as his actions were not so severe or pervasive as to alter the conditions of Beaver's employment and thus did not create a hostile or abusive working environment. Viewing the totality of the circumstances, the District Court stated:

> Michael [Ness's] conduct, while serious, was an isolated incident; there is no evidence of prior sexual offenses in the DNRC by Michael or anyone else. The DNRC took immediate action to protect Kim and to prevent further misconduct by Michael. The offense occurred away from the employees' normal workplace. The Court concludes that Michael's conduct did not create a hostile working environment. The DNRC therefore is not liable under the Montana Human Rights Act, the Governmental Code of Fair Practices, and Title VII.

¶33 Beaver contends that the District Court's conclusion is contrary to the clear weight of authority. She argues that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for

11

purposes of Title VII liability," citing *Tomka; Brzonkala v. Virginia Polytechnic Institute* (4th Cir. 1997), 132 F.3d 949; *and Brock v. United States* (9th Cir. 1995), 64 F.3d 1421 (further citations omitted).  Beaver relies specifically on *Brzonkala* and *Brock* to support her contention that the single incident of sexual assault here constituted conduct that was sufficiently severe or pervasive to alter the conditions of her employment and to create a hostile and abusive working environment.

¶34    In *Brzonkala*, a student at Virginia Polytechnic Institute, during a single incident, was raped three times by two college football players in a dorm room.  She sued the school under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, alleging that Virginia Tech was liable for its discriminatory actions in failing to take adequate remedial action to remedy a known hostile environment.  She also filed a claim under Title III of the Violence Against Women Act of 1994, 42 U.S.C. § 13981.  Although *Brzonkala* did not involve a claim under Title VII, the Court of Appeals for the Fourth Circuit, consistent with numerous other courts engaging in Title IX analysis, applied Title VII principles to define the contours of the plaintiff's hostile environment claim under Title IX.  *See Brzonkala*, 132 F.3d at 958-59 (collecting cases).

¶35    Because the plaintiff never returned to school for fear of retaliatory violence as a result of filing a complaint against the defendants, Virginia Tech argued that, by choosing not to return to campus, the plaintiff could not have been exposed to a hostile environment, an essential element in a Title IX claim.  *See Brzonkala*, 132 F.3d at 959.  The district court

12

agreed with Virginia Tech, concluding that the hostile environment alleged by the plaintiff never occurred, and thereafter dismissed the plaintiff's claim.

¶36    The Fourth Circuit reversed, stating that the plaintiff "pled that she was violently gang raped, and rape 'is not only pervasive harassment but also criminal conduct of the most serious nature that is plainly sufficient to state a claim for hostile environment sexual harassment.'" *Brzonkala*, 132 F.3d at 959 (internal quotation marks omitted).  The Court of Appeals continued, stating that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Brzonkala*, 132 F.3d at 959 (*also citing King v. Board of Regents* (7th Cir. 1990), 898 F.2d 533, 537 (acknowledging that "a single act [of discrimination] can be enough" to state a hostile environment claim under Title VII)). "Thus, the district court failed to recognize that the rapes themselves created a hostile environment, and that Virginia Tech was aware of this environment and never properly remedied it." *Brzonkala*, 132 F.3d at 959.

¶37    However, in holding that the plaintiff had alleged sufficient facts to state a Title IX hostile environment claim against Virginia Tech, the Court of Appeals considered factors beyond the rapes themselves:

> Indeed, the university Provost's rationale for overturning [the defendant's] immediate suspension for one school year . . . itself evidences an environment hostile to complaints of sexual harassment and a refusal to effectively remedy this hostile environment.  Given the seriousness of the harassment acts, the total inadequacy of Virginia Tech's redress, and Brzonkala's reasonable fear of unchecked retaliation including possible violence, Brzonkala did not have to return to the campus the next year and personally experience a continued hostile environment.

13

*Brzonkala*, 132 F.3d at 959-60. It is also important to note that the Fourth Circuit's holding, by its very nature (a review of the district court's granting of Virginia Tech's motion to dismiss), did not resolve whether the incident in question was indeed sufficient to prevail on a Title IX (or Title VII) claim, but only determined that the allegations of the single incident, in conjunction with Virginia Tech's actions, were sufficient to state an actionable Title IX claim against Virginia Tech. Thus, we find unpersuasive Beaver's reliance on *Brzonkala* to support her contention that the single incident of sexual assault, in this instance, was sufficiently severe to alter the conditions of her employment and create a defacto hostile and abusive working environment.

¶38 Beaver also argues that *Brzonkala* is analogous to the present situation because neither plaintiff returned to a hostile environment: the plaintiff in *Brzonkala* because she did not return to school; and Beaver, because when she returned to DNRC she no longer was exposed to Ness. Such an argument, however, improperly removes the employer or institution from the equation. The Court of Appeals in *Brzonkala,* as well as the District Court in the present case, in considering whether a hostile environment existed, reviewed the totality of the circumstances, including remedial measures by the employer or institution. While Beaver notes that Virginia Tech, as well as Ness in the instant case, both similarly reasoned that they should bear no liability since neither plaintiff returned to or continued to experience a hostile environment, the similarity goes no further. The plaintiff in *Brzonkala* did not return to Virginia Tech because, in light of the school's deficient response to the sexual assault and further deficient response to a known hostile environment, the institutional

14

environment *remained hostile*. Contrary to *Brzonkala*, Beaver was able to return to a non-hostile environment because of remedial actions taken by DNRC – the removal of Ness from the workplace.

¶39     Beaver contends that *Brock* is factually similar to the present case and that the Court of Appeals there held that such facts were sufficient to establish a claim of sexual discrimination.  In *Brock*, the plaintiff was employed by the Forest Service and, during an overnight outing, she was forced to share sleeping accommodations with one of her supervisors who subjected her to unwanted physical contact, including rape.  The plaintiff brought a sexual discrimination claim under Title VII and a negligence claim against her employer under the Federal Tort Claim Act, 28 U.S.C. § 1346(b), § 2671 *et seq.* (FTCA).  The federal district court dismissed the FTCA claim, concluding that Title VII provided the exclusive remedy for both her negligence claim and her sexual discrimination claim.  *See Brock*, 64 F.3d at 1422.

¶40     In reviewing the district court's dismissal of the plaintiff's FTCA claim, the Court of Appeals in *Brock* stated that "[a]lthough McKinney's rape and sexual assault of Brock is sufficient to establish a claim of sexual discrimination, that conduct also constitutes more than sexual discrimination." *Brock*, 64 F.3d at 1423.  However, as the case was before the Court of Appeals on a motion to dismiss, the Court merely held that the plaintiff successfully stated an actionable claim for sexual discrimination under Title VII as well as a separately actionable claim under the FTCA, because the "highly personal nature of the harm inflicted" was "beyond the meaning of discrimination." *Brock*, 64 F.3d at 1423-24.  The Court of

15

Appeals did not conclude that the facts alleged in the plaintiff's complaint constituted hostile work environment harassment actionable under Title VII as a matter of law, nor did it provide direction for such analysis.

¶41    Beaver next cites to *Harris v. Forklift Sys., Inc.* (1993), 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295, and *Townsend v. Indiana University* (7th Cir. 1992), 995 F.2d 691, to demonstrate that in cases where there is direct physical harassment, there is no need for a plaintiff to show any other kind of job detriment because the physical harassment itself constitutes an altered working condition sufficient to constitute hostile work environment harassment actionable under Title VII. However, neither case so holds.

¶42    In *Harris*, the United States District Court applied the incorrect legal standard in determining whether the plaintiff's employer created an abusive working environment, concluding that the plaintiff's claim was not actionable under Title VII because the environment was not so severe as to seriously affect the plaintiff's psychological well-being or to otherwise cause her to suffer injury. *Harris*, 510 U.S. at 19-20, 114 S.Ct. at 369-70, 126 L.Ed.2d at 300-01. The United States Supreme Court reversed, holding that, while the effect on the plaintiff's well-being is relevant in considering whether the plaintiff's working environment was abusive or hostile, the correct legal standard is not "whether the conduct 'seriously affected plaintiff's psychological well-being' or led her to 'suffer injury,'" as such a standard "may needlessly focus the factfinder's attention on concrete psychological harm, an element Title VII does not require." *Harris*, 510 U.S. at 22, 114 S.Ct. at 371, 126 L.Ed.2d at 302. Rather, the Supreme Court concluded that the correct legal standard to be

16

applied to determine whether an environment is "hostile" or "abusive" is to view the totality of the circumstances.

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03.

¶43    *Townsend* involved a suit under Title VII prior to its amendment by the Civil Rights Act of 1991. In *Townsend*, the plaintiff, a cleaning woman employed at the Indianapolis campus of Indiana University-Purdue University, sued the University after her complaints of being twice sexually assaulted were ignored by her supervisors and she thereafter began exhibiting symptoms of post-traumatic stress disorder that caused her to take an extended period of unpaid medical leave. *Townsend*, 995 F.2d at 692. Because she voluntarily took unpaid medical leave rather than being fired or demoted, the United States District Court, applying pre-amended Title VII, granted summary judgment in favor of the University, holding that no remedy existed under the pre-amended Title VII where a plaintiff had not been fired or demoted.

¶44    Judge Posner, writing for the Court of Appeals for the Seventh Circuit, reversed. Judge Posner agreed that, under the pre-amended Title VII, if the plaintiff was seeking damages merely for the psychological distress caused by the assaults, "she would be out of luck because the unamended Title VII . . . provides no such remedy. But if the assaults

17

caused severe psychological distress that in turn caused her to lose work and as a result wages, she is entitled to recover those wages . . . ." *Townsend*, 995 F.2d at 693.

¶45 The Court of Appeals did not, as argued by Beaver, hold that the psychological effects of the sexual assault themselves were sufficient to sustain a claim under Title VII. Rather, the Court held that, under the unamended Title VII, the plaintiff had no remedy merely for the psychological distress, but rather, could only recover her back pay if the severe psychological distress, in turn, caused her to lose work and as a result, wages. *Townsend*, 995 F.2d at 692-93.

¶46 As noted above in our discussion of *Harris*, the correct legal standard for determination of whether an environment is "hostile" or "abusive" under Title VII is to review the totality of the circumstances, of which psychological well-being is one factor among many. *Harris*, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-03.

¶47 We acknowledge that the authority offered by Beaver supports the principle that a single incident of sexual assault may alter the conditions of the victim's employment sufficiently to create an abusive working environment. However, that same authority does not direct that Beaver must prevail as a matter of law. Rather, it clearly provides that the inquiry is broader than a simple determination that the incident has occurred. As correctly applied by the District Court, the appropriate standard requires review of all of the facts and circumstances surrounding the incident of sexual assault of Beaver by Ness. From that review, the District Court concluded that the work environment at DNRC was not

sufficiently severe or pervasive to alter the conditions of Beaver's work enviornment. That conclusion was consistent with Beaver's own testimony:

> Q: So for the period after the sexual assault, which was September of 1994, how was your conditions of employment changed in 1994, '95?
>
> A: How were they changed? . . . . I guess they didn't change. I guess there was no change.

¶48 As previously noted, in order for a sexually objectionable environment to be actionable under Title VII, it must be both objectively and subjectively offensive. *Harris*, 510 U.S. at 21-22, 114 S.Ct. at 370, 126 L.Ed.2d at 302. Based upon our review of Beaver's testimony, the District Court correctly concluded that the work environment at DNRC was not subjectively objectionable to Beaver, and thus, cannot have been considered to be the type of hostile or abusive environment actionable under Title VII.

¶49 Regarding the objective offensiveness of the workplace environment, the District Court found that the incident occurred away from the employees' normal work place, that, upon receiving notice of the incident, DNRC took immediate action to protect Beaver and to prevent further misconduct by Ness, that Beaver never saw Ness at work again, and that there was no other evidence of sexual misconduct.

¶50 Based on the foregoing, we conclude that the findings of the District Court are not clearly erroneous. Neither do we find error in the District Court's conclusion of law that, under the circumstances, the single incident of sexual assault did not create a hostile and abusive working environment actionable under Title VII of the Civil Rights Act of 1964.

*ISSUE 2*

19

¶51     *Did the District Court err when it determined that DNRC was not vicariously liable for Ness's actions when he sexually assaulted Beaver?*

¶52     As we have determined that Beaver was not subjected to an abusive or hostile environment actionable under Title VII, we need not reach the issue of whether DNRC is vicariously liable for Ness's conduct.

*ISSUE 3*

¶53     *Did the District Court err when it determined that DNRC did not engage in marital discrimination when it assigned Beaver to a six-month rather than an eight-month position?*

¶54     Beaver contends that Grady's statement–that she did not need to worry about not receiving an eight-month position because she had recently been married and had a new husband to support her–constituted marital status discrimination or, more specifically, "sex-plus discrimination,"[1] by DNRC in its employment decision, and thus contends that the District Court erred in concluding otherwise. Beaver argues that this stereotype–that married women have their husbands to rely on for economic support and therefore are in less need of employment than men–is precisely the type of stereotyping found to be discriminatory by the United States District Court in *Vuyanich v. Republic National Bank* (N.D. Tex. 1976), 409 F.Supp. 1083, and *Tomsic v. State Farm Mut. Auto. Ins. Co.* (10th Cir. 1996), 85 F.3d

---

[1] The theory of "sex-plus" discrimination has been recognized as an actionable theory under Title VII of the Civil Rights Act and is characterized by a person being subjected to disparate treatment based not only on the person's sex, but on the person's sex considered in conjunction with a second characteristic, here, being married. As stated by the court in *Martinez v. NBC, Inc.* (S.D.N.Y. 1999), 49 F.Supp.2d 305, 310: "It is impermissible to treat men characterized by some additional characteristic more or less favorably than women with the same added characteristic." A plaintiff must be able to show that he or she was treated less favorably than a member of the opposite sex who is similarly situated. *Martinez*, 49 F.Supp.2d at 310.

20

1472. However, neither case mandates the conclusion that Grady's statement, in and of itself, constitutes marital discrimination as a matter of law.

¶55 In *Vuyanich*, the United States District Court for the Northern District of Texas denied the defendant's motion to strike allegations from the plaintiff's complaint concerning sexual discrimination. *Vuyanich*, 409 F.Supp. at 1090. The plaintiff had first filed written charges of racial discrimination with the Equal Employment Opportunity Commission (EEOC) based upon her supervisor's comment, just prior to her termination, that she did not need a job because her husband was a Caucasian. *Vuyanich*, 409 F.Supp. at 1089. The EEOC subsequently found reasonable cause to believe that the defendant violated Title VII and issued the plaintiff with a right-to-sue letter. *Vuyanich*, 409 F.Supp. at 1085.

¶56 However, in denying the defendant's motion to strike Vuyanich's sexual discrimination claim, the federal district court merely held that the plaintiff was entitled to include her claims of sexual discrimination in her suit in federal court, notwithstanding the fact that the EEOC failed to recognize the sexual implications of the plaintiff's primary factual allegations. *Vuyanich*, 409 F.Supp. at 1089. It did not hold that Vuyanich's allegations constituted sexual discrimination as a matter of law.

¶57 Beaver claims that *Tomsic* is a case that also represents a scenario constituting sex-plus marital discrimination. In *Tomsic*, the plaintiffs' supervisor, Norman Miller, prior to requesting the resignations of the two female plaintiffs, stated to one plaintiff that she would not succeed in the insurance industry because her husband made too much money and that she would therefore lack incentive. *Tomsic*, 85 F.3d at 1474. During an interview with the

21

second plaintiff, Miller expressed concern to her that marital problems might arise in a few years because she would likely be earning more than her husband. *Tomsic*, 85 F.3d at 1475. Miller later testified that his purpose in making this statement was to try to convince the plaintiff to resign voluntarily. Three days later, a decision was made to fire both plaintiffs, but the decision was not acted upon immediately. Prior to acting on this decision, the plaintiffs were asked to resign voluntarily. Both plaintiffs eventually resigned and brought a Title VII gender discrimination suit against State Farm.

¶58 The United States District Court granted summary judgment in favor of State Farm, concluding, in part, that the plaintiffs had failed to show that Miller's statements had anything to do with the decision to fire the plaintiffs. The district court concluded that, at most, "plaintiffs could argue that discriminatory intent could be inferred from the statements, but this would not be direct evidence of discrimination." *Tomsic*, 85 F.3d at 1475-76. The district court also concluded that plaintiffs had failed to offer sufficient evidence that the defendant's proffered reasons for discharging the plaintiffs were a mere pretext for discriminatory discharge. *Tomsic*, 85 F.3d at 1476.

¶59 Beaver quotes the *Tomsic* court wherein the court stated that Miller, by his comments, displayed "stereotyped views of women and of marriage which he actually held and which may have affected his relationship with plaintiffs in other ways." *Tomsic*, 85 F.3d at 1478. However, this is a question that the *Tomsic* court intentionally left unresolved. The quotation, in context, is as follows:

> The district judge may have been correct in his conclusion, or it may be that Miller was displaying stereotyped views of women and of marriage which he

22

actually held and which may have affected his relationship with plaintiffs in other ways. *The question is not one capable of resolution on summary judgment.*

*Tomsic*, 85 F.3d at 1478 (emphasis added). The Court of Appeals thus remanded the case to the district court for resolution of this and other remaining factual issues by a jury. *Tomsic* does not represent an example of facts constituting sex-plus discrimination as a matter of law.

¶60 Lastly, Beaver attacks the District Court's holding by asserting that Grady's trial testimony about his reasons for selecting Kroll for an eight-month position lacked credibility. Specifically, Beaver contends that, whereas Grady had testified in his deposition from a document prepared by Robert Vlahovich in February, 1995, regarding the comparative qualifications of Beaver, Tovey and Kroll, at trial Grady instead testified from a post-discovery document prepared two weeks prior to trial. Beaver argues that this is evidence that Grady's testimony lacked credibility, and that, where reasons given by an employer for its decision are not worthy of credence or otherwise lack credibility, pursuant to *Reeves v. Sanderson Plumbing Prods., Inc.* (2000), 530 U.S. 133, 120 S.Ct. 2079, 147 L.Ed.2d 105, such testimony is evidence that the reasons given are a pretext for an unlawful discriminatory reason. Thus, Beaver argues that, under the mixed-motive analysis in *Laudert v. Richland County Sheriff's Dep't*, 2000 MT 218, 301 Mont. 114, 7 P.3d 386, Grady's testimony must be taken as evidence that an unlawful consideration played a motivating role in DNRC's employment decision sufficient to support a finding that Beaver was unlawfully discriminated against.

¶61    In *Reeves*, the United States Supreme Court clarified the proper application of the *McDonnell Douglas* test (as defined in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668) which functions as a means of "arranging the presentation of evidence" and establishes the allocation of the burden of production and the "order of the presentation of proof" in cases involving discrimination under Title VII. *Reeves*, 530 U.S. at 142, 120 S.Ct. at 2106, 147 L.Ed.2d at 116; *also see Watson v. Fort Worth Bank & Trust* (1988), 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827, 839.

¶62    As part of the application of the *McDonnell Douglas* test, the determination that the defendant's offered explanation for terminating the plaintiff is unworthy of credence is merely a consideration that the factfinder may utilize to *infer* that the explanation is a pretext for discrimination. *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106, 147 L.Ed.2d at 117. That a trial court may find the defendant's proffered explanation unworthy of credence is, therefore, not conclusive evidence that the reasons given are a pretext for an unlawful discriminatory reason. The veracity of the evidence and the inferences to be drawn therefrom are judgments left to the discretion of the trial court. The district court has broad discretion to determine the effect and weight of the evidence. Absent a showing of an abuse of discretion, the trial court's determination will not be overturned. *Vincelette v. Metropolitan Life Ins. Co.*, 1998 MT 259, ¶12, 291 Mont. 261, ¶12, 968 P.2d 275, ¶12 (citation omitted); *also see Spooner Constr. & Tree Serv. v. Maner*, 2003 MT 43, ¶ 35, 314 Mont. 268, ¶ 35, 66 P.3d 263, ¶ 35 ("In non-jury trials the credibility of witnesses and the

24

weight of the evidence given to their testimony, and the evidence presented at trial, is a matter left to the discretion of the district court").

¶63    We also disagree with Beaver that the mixed-motive analysis adopted in *Laudert* is appropriate in the present case.  This Court adopted the mixed-motive analysis from the United States Supreme Court decision of *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268.  The *Price Waterhouse* approach is appropriate where the plaintiff presents direct evidence of discrimination and where the parties do not agree on the reason for the challenged employment decision.  As this Court noted in *Laudert*, statements by nondecisionmakers do not constitute direct evidence.  *Laudert*, ¶ 26.  Here, the statement alleged by Beaver to be indicative of discriminatory employment action was made by Grady, while it was Ahner who made the final employment decision.  Thus, the *Price Waterhouse* approach is inappropriate in the instant case.

¶64    DNRC responds that, assuming *arguendo*, Beaver could meet the initial burden of establishing a prima facie case of discrimination under *McDonnell Douglas*, DNRC presented overwhelming evidence that Kroll had more firefighting and training experience than Beaver, including as a volunteer firefighter, wild land firefighter and equipment operator.  DNRC also notes that Beaver presented no evidence to refute Kroll's substantial experience or training above and beyond that of Beaver.

¶65    Upon production of this evidence, the burden shifted back to Beaver to prove by a preponderance of the evidence that the reasons DNRC offered for giving Kroll the eight-month position instead of Beaver were not DNRC's true reasons, but were a pretext for

25

discrimination. *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106, 147 L.Ed.2d at 117. Beaver, however, offered only the "after the fact" statement made by Grady that Beaver, having been recently married, did not need the eight-month position because she now had her husband to take care of her. Moreover, Ahner testified that, based upon the employees' respective experience, he would have been surprised if Grady had made any other recommendation, and "would have requested [Grady] to visit with me as to how he had made an evaluation that would come up with a different selection than what he in fact did."

¶66 The District Court described Grady's statement to Beaver–that she did not need the eight-month position because she was now married– as "inappropriate and sexist," but found that the decision to assign Beaver to the six-month position was not made because of her marital status. The District Court concluded that, rather than being indicative of marital discrimination, Grady's statement was an attempt "to pacify [Beaver] after the fact by reminding her that she had less to lose than her two co-workers." Further, apart from Grady's "after the fact" statement, there is no testimony in the record that Grady or Ahner ever considered Beaver's marital status in the employment decision-making process.

¶67 We agree with the District Court that such statement by a supervisor is highly inappropriate. However, based on the evidence, the District Court did not clearly err in finding that the employment decision made by Ahner did not involve or constitute marital or sex-plus discrimination. We hold, therefore, that the District Court did not err in concluding that DNRC did not discriminate against Beaver on the basis of her marital status. Its decision is affirmed accordingly.

26

¶68    *Did the District Court err when it determined that DNRC did not retaliate against Beaver for filing a claim of discrimination when it assigned her to a six-month rather than an eight-month position?*

¶69    Beaver alleged in the District Court that her assignment to the six-month firefighting position instead of one of the eight-month positions is evidence of retaliation against her for filing her discrimination complaint against DNRC with the Human Rights Commission. The District Court disagreed, concluding that Ahner's decision to place Beaver in the six-month position was not made because of her complaint. Beaver contends that the evidence demonstrates otherwise, arguing that, before the job restructuring, Beaver, Tovey and Kroll all worked the same amount of time each year, and that it was only after she filed her complaint with the Human Rights Commission that DNRC reduced her hours from nine months to six months per year while Tovey and Kroll continued to work eight months.

¶70    Beaver also points to Grady's friendship with Ness and the fact that Grady knew that something had happened between Beaver and Ness in White Sulphur Springs and also knew that, as a result of that event, Ness no longer worked for DNRC. Beaver does not allege, however, that Grady had actual knowledge that Beaver had indeed filed a complaint with the Human Rights Commission, and, in fact, the evidence indicates otherwise. However, Beaver maintains that the ultimate decision regarding who received which firefighting position rested with Ahner, and notes that Ahner did have actual knowledge that Beaver had filed a complaint with the Human Rights Commission.

¶71 A plaintiff bringing an action for retaliation under Title VII must first establish a prima facie case of retaliation "by showing that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and that there was a causal link between the two." *Wrighten v. Metropolitan Hosps., Inc.* (9th Cir. 1984), 726 F.2d 1346, 1354 (citation omitted). Beaver argues that the first two elements were satisfied by virtue of filing her initial complaint with the Human Rights Commission, thereby engaging in a protected activity, and by demonstrating that DNRC thereafter restructured her position differently than her co-workers, thereby suffering an adverse employment decision by DNRC.

¶72 She argues that the third *Wrighten* element, that there was a causal link between the protected activity and the adverse employment decision, is evidenced by the temporal connection between the filing of her complaint and her assignment to the six-month position along with the fact that Grady, although not knowing that Beaver had filed a complaint with the Human Rights Commission, was aware that something had happened in White Sulphur Springs and that the result of that event is that Ness no longer worked at DNRC. Beaver also points out that Grady and Ness were friends, that Grady sat next to Ness during the trial, and, further, that Ahner, the person who made the final decision regarding Tovey, Kroll and Beaver's employment, did know that Beaver had filed a complaint with the Human Rights Commission and, in fact, was the person who prepared the response on behalf of DNRC.

¶73 The District Court concluded that neither the second nor third element was satisfied, finding that, rather than suffering an adverse employment decision, Beaver received a better

28

position, yet less favorable than either Kroll or Tovey, both of whom had more firefighting experience than Beaver. The District Court concluded that the decision to assign Beaver to a six-month position was based on the employees' relative firefighting experience, and not because she had filed a complaint against DNRC.

¶74 The District Court's findings are supported by substantial evidence. As noted by the District Court, the evidence indicated that the three employees had different training in the various areas pertinent to the job. Beaver had more training than Kroll as a strike team leader, in fire suppression tactics and advanced fire behavior and helicopter operations, but that training was not required for the eight-month position. Both Kroll and Beaver began their employment at DNRC in 1990, Beaver beginning in an entry level position and having no previous firefighting experience, and Kroll having previously been trained for wildland fires, having been a volunteer for the Baxendale Fire Department and working fighting fires in the 1980's.

¶75 The evidence also supports the District Court's finding that Beaver was better off after receiving the assignment to the six-month position than before her assignment, which the Court noted in concluding that the job assignment was not retaliatory. As a seasonal firefighter, Beaver was guaranteed only between sixty-five and seventy-one days of work each year, with all additional time being discretionary, depending on available funding, the fire season and other factors. However, Beaver, Tovey and Kroll had each worked both early and late in the fire season at the discretion of DNRC. It is only in these discretionary hours that Beaver claims a cut in work hours. Beaver's guaranteed core hours increased

from approximately 568 hours per year to 1056 hours per year when Beaver was assigned to the six-month position. Further, Beaver admitted in her testimony that neither Ahner, Morris nor Grady was upset with her for filing a complaint with the Human Rights Commission.

¶76     We emphasize that Beaver's receipt of a better position than she formerly held does not, of itself, eliminate the possibility that she may have been retaliated against in the process of assigning the newly created, improved positions. However, based upon consideration of all the evidence presented, we hold that substantial evidence supported the District Court's conclusion that the DNRC had legitimate, non-retaliatory reasons for assigning Beaver to the six-month position instead of the eight-month position. Its decision is affirmed accordingly.

*ISSUE 5*

¶77     *Did the District Court err when it determined that Beaver was not entitled to punitive damages from Ness?*

¶78     As the trier of fact, the District Court found that Ness was not guilty of actual fraud or actual malice and was thus not liable for punitive damages pursuant to § 27-1-220, MCA (1993). Said section provides in part:

> **Punitive damages–when allowed.** (1) Except as otherwise expressly provided by statute, a judge or jury may award, in addition to compensatory damages, punitive damages for the sake of example and for the purpose of punishing the defendant.

Section 27-1-221, MCA (1993), provides in part:

> (1) Subject to the provisions of 27-1-220 and this section, reasonable punitive damages may be awarded when the defendant has been found guilty of actual fraud or actual malice.

(2) A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
(a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
(b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.
(3) A defendant is guilty of actual fraud if he:
(a) makes a representation with knowledge of its falsity; or
(b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury.
(4) Actual fraud exists only when the plaintiff has a right to rely upon the representation of the defendant and suffers injury as a result of that reliance
. . . .
(5) All elements of a claim for punitive damages must be proved by clear and convincing evidence. Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. It is more than a preponderance of the evidence but less than beyond reasonable doubt.
(6) Liability for punitive damages must be determined by the trier of fact, whether judge or jury.

¶79   We review a district court's findings of fact to determine whether its findings are clearly erroneous. *Holtz v. Deisz*, 2003 MT 132, ¶ 15, 316 Mont. 77, ¶ 15, 68 P.3d 828, ¶ 15 (citation omitted). This Court does not lightly overturn the verdict of a finder of fact. *Onstad v. Payless Shoesource*, 2000 MT 230, ¶ 56, 301 Mont. 259, ¶ 56, 9 P.3d 38, ¶ 56. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Holtz*, ¶ 15 (citation omitted). We have further stated that the test of substantial credible evidence allows for reversal only if there is an absence of probative facts to support the verdict. *Onstad*, ¶ 56.

31

¶80 Beaver contends that the District Court erred in finding that Ness's actions did not constitute either actual fraud or actual malice. While the District Court concluded that Ness "was unable to control his impulses," resulting in his actions constituting sexual assault of her, Beaver contends that the evidence demonstrates that Ness's actions were not just a spur-of-the-moment development.

¶81 Upon review of the record, we agree with Beaver that the record clearly demonstrates that Ness worked for several hours to place Beaver into a position where she would be vulnerable to his sexual advances. As noted by Beaver, Ness's decision to stay overnight was made in spite of Beaver's continued objections and despite the fact that firefighters routinely drove home from White Sulphur Springs to Helena at the end of the work day. Beaver further notes that Ness checked into a single motel room without consulting her and first told her that it was the only room available. It was only after checking in to the room that Ness told Beaver that there was another room available. However, Ness also told Beaver that she would have to pay for any additional room with her own money and would likely not be reimbursed by DNRC. Additionally, although Ness represented to Beaver that their reason for spending the night in White Sulphur Springs was to complete the contracts the next morning, they did not attempt to complete the unfinished contracts, but rather, left them with the sheriff's office to have the sheriff complete them.

¶82 Under these facts, this Court is left with the definite and firm conviction that the District Court misapprehended the effect of the evidence and that a mistake in its findings of fact was committed when it found that this was a matter of Ness's "inability to control his

32

impulses." There is no question that Ness made a false representation to Beaver that their reason for staying overnight was work-related, and further, that Ness had knowledge of the falsity of his statement when making it. Moreover, as Ness was Beaver's supervisor, Beaver had a right to rely on the verity of Ness's statement that the justification for staying overnight was work-related and not for any other reason. The evidence unquestionably demonstrates that work-related matters were clearly *not* the reason that Ness rented the motel room. Rather, the evidence demonstrates deliberate planning on the part of Ness to put Beaver in a place where he could sexually assault her. We hold that such facts constitute actual fraud under § 27-1-221(3) and (4), MCA, (1993), and thus conclude that the District Court erred when it determined that Ness was not guilty of actual fraud.

¶83    A factfinder "may award, in addition to compensatory damages, punitive damages for the sake of example and for the purpose of punishing a defendant." Section 27-1-220, MCA. Further, § 27-1-221, MCA, provides that "reasonable punitive damages may be awarded when a defendant has been found guilty of actual fraud or actual malice." Having reversed the District Court by concluding that Ness's conduct constituted actual fraud under the statute, we remand for the factfinder to determine whether an award of punitive damages is appropriate, and if so, in what amount.

*ISSUE 6*

¶84    *Were the compensatory damages awarded by the District Court incomplete and inadequate?*

33

¶85 We review a District Court's grant of compensatory damages to determine whether the district court abused its discretion. *Kiely Constr. L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 102, 312 Mont. 52, ¶ 102, 57 P.3d 836, ¶ 102 (citation omitted). The amount to be awarded is properly left to the finder of fact, and this Court will not substitute its judgment unless we find the judgment to be the product of passion or prejudice. *Albinger v. Harris*, 2002 MT 118, ¶ 43, 310 Mont. 27, ¶ 43, 48 P.3d 711, ¶ 43 (citations omitted). In all cases, damages must be reasonable, and the amount of award rests of necessity in the sound discretion of the trier of fact. *Kiely*, ¶ 102; *Bottrell v. American Bank* (1989), 237 Mont. 1, 22-23, 773 P.2d 694, 707; *Vinion v. Wood Yard, Inc*. (1988), 232 Mont. 110, 113-14, 755 P.2d 31, 34; § 27-1-302, MCA. "Only when the amount awarded is so grossly out of proportion to the injury as to shock the conscience will an appellate court intervene." *Kiely*, ¶ 102; *Onstad*, ¶ 50.

¶86 The District Court awarded Beaver compensatory damages in the amount of $9,095: $3,095 for expenses incurred in therapy to date, $1,000 for expenses Beaver expected to expend in future therapy, and $5,000 for the emotional distress suffered from the sexual assault. Beaver argues that this amount is incomplete and inadequate because the District Court erroneously found that Beaver had not been subjected to sex and marital discrimination and retaliation. That argument has been negated by our earlier discussion. However, Beaver further contends that she presented uncontroverted testimony that she suffers and had suffered for the five years preceding trial from post-traumatic stress disorder,

34

and that her award, when compared to awards from similar acts in other cases, demonstrates an abuse of discretion by the District Court.

¶87    Beaver points to three cases where plaintiffs received higher compensatory damage awards: the district court case of *Todd v. Ortho Biotech, Inc.,* (D. Minn. 1996), 949 F.Supp. 724, and the two Montana Supreme Court cases of *Onstad* and *Vainio v. Brookshire* (1993), 258 Mont. 273, 852 P.2d 596.  In *Todd*, the district court awarded $90,000 to the plaintiff for pain, emotional distress, and loss of enjoyment of life.  *Todd*, 949 F.Supp. at 730.  A review of the district court's findings of fact in *Todd* reveal egregious facts dissimilar to those presented to the District Court in the present case, including repeated contact with the defendant after the sexual assault because of lack of action on the part of her employer, the employer's lack of timely investigation into the charges of sexual assault by the defendant while instead conducting a criminal background check of the victim plaintiff while concealing that information from her and failing to complete a criminal background check on the accused defendant.  *Todd*, 949 F.Supp. at 728.  The plaintiff also required extensive psychological treatment, including medication, and was eventually unable to return to work any longer.  She also suffered from "vivid and terrifying nightmares, anxiety, phobias and other extreme psychological difficulties, including post-traumatic stress disorder.  She is unable to maintain meaningful new personal relationships, travel, or work at gainful employment."  *Todd*, 949 F.Supp. at 729.

¶88    As previously noted, Beaver did not have further contact with Ness at work at any time after she reported the incident; DNRC did not take inappropriate action against Beaver,

35

such as conducting an unauthorized criminal background check, and although Beaver's therapist felt that Beaver had early on suffered with post-traumatic stress disorder, her therapist also testified that she believed Beaver's symptoms had subsided by the time of trial and also testified that her "prognosis is good once this issue is resolved for her." Her therapist further testified that Beaver only need to complete her current treatment and that Beaver would unlikely need further therapy or treatment related to the sexual assault unless she experienced another trauma in her life that was similar. Further, unlike the plaintiff in *Todd*, Beaver required no medication and was not only able to return to work, but did not miss any work because of the incident.

¶89 While the plaintiff in *Todd* received a much higher award in compensatory damages than Beaver, the facts were also sufficiently different that the difference in award amounts was legitimately within the discretion of the factfinder and such difference is not one that "shocks the conscience."

¶90 In *Vainio*, the District Court affirmed an award of $20,000 given to the plaintiff by the Human Rights Commission. We determined that the District Court's affirmation was not clearly erroneous, as the District Court found that the defendant's conduct toward the plaintiff included, among other things, "brushing his body against her buttocks, putting his hand up her skirt, grabbing her breasts, and requesting [the plaintiff] to have sex with him." *Vainio*, 258 Mont. at 280-81, 852 P.2d at 601. Again, the difference between the amount awarded in *Vainio* and the amount awarded to Beaver is not sufficiently different to shock the conscience.

36

¶91    Finally, Beaver points to this Court's decision in *Onstad*, where the jury, in a special verdict, found the defendant, Payless ShoreSource, liable for compensatory damages in the amount of $500,000. The jury found that Payless was negligent in failing to take precautions for its employees' safety following three previous incidents at Payless locations, including an incident at the same store where the plaintiff was sexually assaulted and where the same defendant had previously exposed himself to a female employee. *Onstad*, ¶¶ 12-13.

¶92    The plaintiff, an employee of Payless, was physically assaulted by the defendant. When the plaintiff went into the back storeroom for safety and to call for help, the defendant followed her and forced his way into the storeroom with her. The defendant eventually grabbed her from behind, held his hand over her mouth and demanded to have sex with her, threatening to kill her if she refused. *Onstad*, ¶¶ 8-9. When the plaintiff continued resisting and struggling, the defendant knocked her to the floor and stood over her masturbating until he ejaculated on her. The plaintiff later testified that she truly thought the defendant was going to rape and then kill her. *Onstad*, ¶ 51. We discussed the substantial trauma which Onstad sustained:

> Onstad's mother testified that following the attack, Onstad withdrew from college, returned to live with her parents, and, for the next several months, "was very withdrawn. She slept a lot. She didn't sleep at night, but during the day she just continued sleeping a lot. She went nowhere. She didn't visit with friends. She was scared and totally not herself. She was just kind of totally withdrawn." In addition, Dr. Martin testified that as a result of the attack, Onstad's "sense of safety, security, her sens of herself has really been violated, she felt extremely powerless, and also ended up really embarrassing her and humiliating her. Ashamed. It's affected her whole sense of self-esteem and self-confidence."

*Onstad*, ¶ 51.

¶93   This Court held that the jury was properly instructed and that the plaintiff was "entitled to reasonable compensation for any pain and suffering she experienced and would reasonably probably experience in the future, and that the law does not set a definite standard by which to calculate compensation for mental pain and suffering." *Onstad*, ¶ 52. We held that the "amount of compensatory damages awarded by the jury is not so grossly out of proportion to [the plaintiff's] posttraumatic stress injury as to shock the conscience." *Onstad*, ¶ 52.

¶94   While the amount of the award of compensatory damages in the instant case appears to be relatively small in comparison to the plaintiff's in *Onstad*, the amount of compensatory damages awarded is ultimately dependent on the facts of each case and remains, of necessity, within the discretion of the factfinder.   Given that the law does not set a definite standard by which to calculate compensation for mental pain and suffering, but rather, that such calculation remains within the province of the factfinder, absent a judgment that is the product of passion or prejudice, this Court will not substitute its judgment for a decision within the sound discretion of the factfinder.   Further, we conclude that the award of compensatory damages in the instant case is not so grossly out of proportion to Beaver's injury as to shock the conscience.  The District Court's award of compensatory damages is affirmed accordingly.

¶95   Affirmed in part, reversed in part, and remanded.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER
/S/ JAMES C. NELSON

Justice John Warner concurring.

¶96    I agree in the result reached by the majority opinion.  I do not agree that the District Court necessarily made a mistake in its findings of fact when it found this was a matter of Ness' "inability to control his impulses."  Decisions of fact are for the trial judge when the case is tried to the Court.  *See Han Farms, Inc. v. Molitor*, 2003 MT 153, ¶ 9, 316 Mont. 249, ¶ 9, 70 P.3d 1238, ¶ 9.

¶97    The District Court found as matters of fact:

> 17.    The Court finds that Michael sexually assaulted Kim without her consent.
>
> 18.    The Court finds that Michael did not engage in actual fraud or actual malice. The facts indicate that he was attracted to Kim and was unable to control his impulses.  His motive does not rise to the level of actual malice.

¶98    The District Court concluded as a matter of law that because the Court found as the trier of fact that Ness did not engage in actual fraud or actual malice he was not liable for punitive damages.

¶99    While the record might support a finding that Ness worked for several hours to place Beaver in a position where she would be vulnerable to assault, this Court must, in my view,

40

accept the trial judge's finding that such was not the case.

¶100   It was up to the trial judge to determine whether to believe Beaver when she said she continually objected to staying overnight.

¶101   Whether there was indeed another room available before the pair had already checked into the motel, or whether Ness was telling the truth when he said it became available afterwards, is not for this Court to decide.  The same is true whether she believed she would have to pay for her own room if she wanted one.

¶102   Whether Ness was untruthful when he said the overnight stay was work related is not for this Court to determine.  From the cold record we cannot now say that the evidence unquestionably demonstrates that work related matters were not, at least initially, the reason for the stay in White Sulphur Springs and for renting the motel room.

¶103   It is not certain there was more work for these parties to do the next morning.  Perhaps there was.  The fact that there was no work actually done is understandable, given what happened the previous night.  Again, this is for the fact finder.

¶104   It is the District Court that saw and heard the witnesses.  Deliberate planning and lies amounting to actual fraud, based on clear and convincing evidence, in my view, should not be facts determined by this court.

¶105   Nevertheless, as stated in ¶ 78 above, § 27-1-221(2), MCA, provides that if Ness deliberately disregarded facts that created a high probability of injury to Beaver and still proceeded to act in intentional disregard of the high probability of such injury, he was guilty of actual malice.  There is no mention of motive in the definition of malice.

41

¶106 The findings of the District Court that Ness assaulted Beaver and that he was unable to control his impulses, which must mean that the trial judge believed the assault was an unplanned, spur of the moment thing, does not change the fact that Ness acted intentionally and that he was aware of a high probability, even a certainty, that Beaver would be damaged.

¶107 Malice is present when there is a wish to vex, annoy, or injure another person. *Cashin v. Northern Pac. Ry. Co.* (1934), 96 Mont. 92, 110-11, 28 P.2d 862, 869. The statutory definition of actual malice, § 27-1-221(2), MCA, is an objective criterion for determining malice, which is based on a person's deliberate behavior stemming from an intentional disregard for probable injury to another. *Plouffe v. DPHHS*, 2002 MT 64, ¶ 29, 309 Mont. 184, ¶ 29, 45 P.3d 10, ¶ 29. As a matter of law, the conduct of Ness as found by the District Court constitutes actual malice.

¶108 The District Court's finding of fact that an assault occurred is supported by substantial evidence. The finding of fact that Ness' motive did not rise to the level of actual malice is incorrect. The act of the assault constitutes malice. The District Court's conclusion of law that Ness could not be liable for punitive damages is erroneous. Ergo, I agree that this matter must be remanded for consideration of punitive damages pursuant to § 27-1-220(1), MCA.

/S/ JOHN WARNER